IN THE MATTER OF THE APPLICATION OF JAMES C. KELSEY FOR A FOREIGN JURY OR IN THE ALTERNATIVE FOR A WRIT OF CERTIORARI TO REMOVE AN INDICTMENT FOR MURDER (AND CERTAIN OTHER INDICTMENTS) PRESENTED AGAINST HIM IN THE WARREN COUNTY COURT OF OYER AND TERMINER INTO THE NEW JERSEY SUPREME COURT.

Argued January 20, 1942—Decided February 4, 1942.

Before Justices BODINE, PERSKIE and PORTER.

For the petitioner, *Saul N. Schechter* and *R. Robinson Chance*.

For the respondent, *Claude E. Cook*.

BODINE, J.   James C. Kelsey stands indicted for murder and for several other offenses committed in Warren County. He seeks a writ of *certiorari* to remove the indictments into this court for the purposes of securing the following relief: (a) A change of venue for the trial of the indictments; (b) in the alternative, a foreign jury for the trial of the indictments; (c) the quashing of the murder indictment for matters dehors, the record, and more particularly because the indictment was presented by the Warren County grand jury, admittedly before the case against petitioner had been completely investigated; (d) or in the alternative, to secure award for a foreign jury for the trial of the indictments against him should the removal into this court by *certiorari* be unnecessary.

On May 5th, 1941, Kelsey is alleged to have shot and killed Edward Courtney. On May 14th, 1941, he was indicted and Judge Edward A. McGrath was designated to try the indictment, Judge Egbert Rosecrans having disqualified himself. The trial was fixed for June 9th, 1941. An application was made for admission to bail which was denied. Another application was made to Mr. Justice Porter who granted the application June 2d, 1941.

Throughout the case it appears that haste was the order of the day. The indictment was found before the state had

completed its investigation of the cause, and the only witness called was Trooper Wolfe who had no first hand information of the facts. The other witness before the grand jury was a physician, who presumably testified to the death of Courtney.

Mr. Kelsey is a resident of Great Meadows, Warren County, where he lives with his wife and two children. He maintains a Wall Street office in New York City. On the evening of May 2d, 1941, he was at Weber's Tavern, about a mile from his residence. The deceased and a companion entered and drank a number of whiskies. They were very boisterous, boasting that they had broken up the last tavern they had stopped at as a result of argument over "Aid to Britain." The deceased was a driver of a moving van and was intoxicated. His helper asked for assistance in getting the ignition key of the machine because he thought him too drunk to drive. Courtney wanted a fight, which Kelsey did not desire. The deceased was a man 5 feet 11 inches tall, weighing 200 pounds and appeared possessed of great physical strength. Kelsey was compelled to remove his glasses and was struck several violent blows on the side of his face. Kelsey had, at that time, in his pocket a 25 calibre Colt automatic pistol. Tired of being beaten up, he fired a shot to one side, which seems to have struck the deceased's hand, but the wound was slight. Kelsey then fled towards his home about a mile distant. He was continually pursued by Courtney, and when he reached his house and bolted the door, Courtney pounded for admission, went into the basement and procured heavy ornaments and hurled them through the windows. He continued his effort to break into the house and was in the basement when he was shot and fatally wounded.

The petitioner's residence appears to be an old fashioned stone house removed from other dwellings. His wife was unable to get aid from the state police, being told over the telephone that there was no one at the moment who could be sent to the house which was being stormed by the drunken and violent Courtney.

The *Easton Express* of May 3d said: "As Courtney approached the house Kelsey is alleged to have again opened

fire and a bullet struck Courtney in the shoulder and one or two bullets lodged in his back."

The *Morning Free Press* of May 3d said: "Courtney chased Kelsey from the tavern and hotly pursued him to his home, about a quarter of a mile west of the tavern, on route 6. When Kelsey reached the house he ran inside and shot the New York man in the back twice and in the left shoulder, state police said." Similar comment was made in the *Morning Free Press* of May 5th. The *Morning Free Press* of May 6th, announcing the death of Courtney, recalled an altercation Kelsey had had with his former wife, and the following paragraph appeared: "The affair with his wife occurred the day after court action at Belvidere, at which Kelsey had been discharged from Illinois indictments resulting from kidnap and conspiracy charges preferred by the former wife. The ex-Mrs. Kelsey sought custody of his daughter, Rosanna, 6." The same matter was printed in the issue of May 7th.

The *Hackettstown Gazette* of May 9th in commenting upon the affair said: "Kelsey had been barred from any of the social events due to his habit of causing disturbance and unpleasant feelings among the localities of Great Meadows." The *Warren Journal* of Friday, May 9th, said: "Kelsey a Wall Street analyst, was in the tavern, according to Blairstown state police, when Courtney, a truck driver, entered. An argument followed, in the course of which Kelsey is alleged to have shot Courtney in the hand with a revolver. Kelsey went to his home, a quarter of a mile away, and the fatal shooting occurred when Courtney followed him, the troopers said."

Part of the dead man's story appeared in the *Easton Express* of May 29th. It was his contention that he was shot while in the cellar of Kelsey's house and when he ran out he was shot some more.

The *Washington Star* of May 29th contains a long article in which the prosecutor's opposition to bail is set forth. The state felt that the case was a serious one, and that they must move with caution and could not safely disclose their case.

After the release of Kelsey on bail, Courtney's helper, held as a material witness, was also released.

From the headings in the local papers, it is apparent that Kelsey was not too highly regarded in the community in which he had taken up his residence.

Mrs. Dorothy Cook said that hearing the matter discussed in Phillipsburg, she heard a person say she hoped Kelsey would burn. Another witness had heard bitter remarks, which manifested hostility, as she went around in the neighborhood. Dalrymple, another witness called, saw Kelsey running away from Courtney as he passed the loading platform where he was working and Kelsey shouted "stop the man. He is crazy." Kelsey ran around the platform two or three times. There were other men working there but they just did not bother to help.

There are pending against Kelsey an indictment for murder, an indictment for carrying concealed weapons and two indictments for assault.

Rev. Victor Tudor, a Presbyterian minister, having charges at Great Meadows and Rockport, testified that many people whom he talked to were of the opinion that Kelsey was in the wrong and pointed to newspaper accounts of the shooting; that there was still resentment against Kelsey in that he had sought to have a post office established to be designated as "Kelsey Park" at a point formerly known as Townsbury. He did not regard Kelsey as a dangerous or quarrelsome man.

Edward S. Goodnow, a real estate broker, testified that there was a decidedly antagonistic feeling about a new man coming into the community and attempting to establish a post office. That was what Kelsey had done and he felt that "a puff of wind" might arouse sufficient prejudice so that Kelsey could not secure a fair trial in Warren County.

On May 1st, Mr. Kelsey, who was fond of the outdoors, had obtained the privilege of entering the grounds of the Pequest Valley Rod & Gun Club. The manager had told him that if he took his children there it would be well to carry a firearm because there was danger of wild dogs. He put a small revolver into his pocket and had not removed it when he walked over to the tavern on the 2d.

Petitioner's first point is that no judgment against an accused can legally be rendered on the indictment since the

case is manifestly one of justifiable or excusable homicide. That question may be, when all the proofs are in, one for a jury. The argument seems to be that the grand jury had insufficient evidence to justify the indictment, and that by the finding of the indictment they have infringed upon the right of the accused to be brought to the bar of justice by a proper indictment predicated upon legal evidence. However, this court will not quash an indictment found by a grand jury upon illegal evidence or without legal evidence, saving the right, however, to quash for misconduct in the grand jury. No misconduct is made to appear by the record save that action may have been taken without sufficient legal evidence, which is no ground for quashing the indictment. *State* v. *Dayton*, 23 *N. J. L.* 49; *State* v. *Ellenstein*, 121 *Id.* 304.

The murder indictment is in the usual statutory form. We cannot regard the enactment of such statute as violative of any constitutional provision. It is definitely settled in many cases that the legislature may regulate the procedure in courts of law.

Mr. Kelsey was referred to in some of the newspaper articles as the "Great Meadows gun toter," a "human arsenal" and a "hot head," but these phrases will all be forgotten before the trial takes place. The other newspaper articles were somewhat sensational, but they were the kind which usually appear, and there is no evidence that there was any desire upon the part of the authors thereof to prejudice the defendant in the community in which he resided. The articles will soon be forgotten and may be attributed to the zeal of the prosecuting officer to present the state's case to the public in advance of trial. This practice, and the common practice of making veiled suggestions that most damaging evidence is about to be brought forth, is to be sincerely deprecated in officials who are sworn to administer even handed justice. It is a very common practice, but one which should be checked by those who have a proper regard for the rights of others. The blame is not entirely on one side. The desire for the front page is very prevalent.

The foregoing circumstances are hardly sufficient to justify the award of a foreign jury. When the trial takes place, the

jurors summoned will fail to remember what they have read in the papers; they will be guided by the law and the proofs. The community is made up of sincere law abiding men and women. They will be guided by their oath and not by prejudice or passion.

The rule will be dismissed, but without costs.