THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ALBERT WISE, HARRY WISE AND ALFRED STOKES, DEFENDANTS-APPELLANTS.

Argued May 9, 1955—Decided June 20, 1955.

*Mr. Albert L. Kessler* argued the cause for appellant Albert Wise.

*Mr. Jacob R. Mantel* argued the cause for appellant Harry Wise (*Mr. Allen Kaufman*, on the brief).

*Mr. Otto E. Adolph* argued the cause for appellant Alfred Stokes (*Mr. Frederick C. Vonhof*, on the brief).

*Mr. H. Russell Morss, Jr.*, Prosecutor of Union County, argued the cause for the State (*Mr. Hyman Isaac*, Assistant Prosecutor).

The opinion of the court was delivered by

WACHENFELD, J. These three defendants, severally admitting their guilt of the murder charge upon which they were tried, having been convicted of first-degree murder without a recommendation by the jury, appeal the judgment of death rendered against them, contending they were denied a fair trial and were prejudiced by legal error committed requiring a reversal.

Each defendant was represented by separate court-assigned counsel who for their respective clients submitted briefs and argued the cause before us.

The factual situation, although not complicated nor in dispute in many instances, will be fully set forth so its relationship to the legal issues presented can more easily and effectively be visualized.

In the early morning of February 12, 1954, Albert Wise left his home at 234 9th Avenue, Roselle, New Jersey, and drove his Mercury sedan to the home of Alfred Stokes, on Union Street in the City of Elizabeth. Stokes joined him in the car, and together they proceeded to Roselle to the home of Albert Wise's mother, with whom Albert's brother, Harry Wise, was living. There they picked up Harry, and the three of them drove to the Tuscan Dairy in Union Township, arriving there at about 10 A. M. Albert Wise, the leader of the trio, had worked at the dairy some eight years earlier, but the purpose of their visit on this occasion was to "case" the set-up in contemplation of a later robbery.

Their mission completed, they returned to the Wise family home in Roselle, went to Harry's room and then decided to go back and rob the dairy. Shortly thereafter, they again left the house and, with Albert at the wheel, retraced their earlier route to the Tuscan Dairy. On the way, they stopped once to remove the rear license plate from the Mercury. During the ride, Albert gave Harry an old .32 cal. revolver, to Alfred Stokes he gave a new .32 cal. Harrington and Richardson revolver, serial No. 103759, and for himself he kept a nickel-plated .22. He had obtained the guns earlier

that morning from a field in back of his mother's house where he had them hidden.

Thus armed, they arrived at the Tuscan Dairy and parked the Mercury on the southern side of Union Avenue, on the opposite side of the street from the dairy facing the Garden State Parkway. They got out of the car, walked across the street and entered the dairy grounds through a gap in the fence. From there they proceeded to the business office of the dairy, which they entered with revolvers drawn.

Once inside, Albert curtly announced: "This is a hold-up," and ordered the employees who were working there to line up against the wall, hands over their heads. Stokes stood guard over them, and Harry Wise was stationed in the hallway just outside the main office. Albert went directly to the cashier's room, where the safe was located, emptying its contents, some $1,400 and a bunch of keys, into the pockets of his grey tweed coat. He told Stokes to lock the employees he was guarding in a closet and in a bathroom, which Stokes did, taking a wallet containing about $90 in bills and some old coins from one of them, Altman, as he did so. Albert attempted to cut the cable connections to the switchboard, and while this was going on, another employee of the dairy, Jose Gallegos, entered the building looking for his mail. He started to leave but was spotted by Harry Wise, who brought him back into the office and locked him in a closet.

The three defendants then ran out of the office building, Harry in the lead, and were making their way toward the gap in the fence by which they had entered when Sergeant Clinton E. Bond, of the Union Township Police, drove by on Union Avenue in a police patrol car. At the time, Bond was on routine patrol duty but apparently his suspicions were aroused by the sight of the three men running along the fence inside the dairy grounds. He stopped his car momentarily and then drove off, going rapidly down Union Avenue toward the main entrance leading into the Tuscan Dairy grounds. Albert, Harry and Alfred, having observed this movement of the patrol car, abandoned their escape route

and fled north through the dairy grounds, on which several large barns were located. As they rounded the rear of barn No. 1, they encountered Sergeant Bond, who had in the meanwhile driven his patrol car from the main entrance north between the barns.

Sergeant Bond ordered the men to approach the car, and as they did so, he may have noted the revolver which Harry Wise still had in his hand. Bond opened the door of the patrol car, started to get out, but as he did so Harry Wise grabbed him by the rear of the coat and together with Albert began assaulting him. While struggling with them, Bond attempted to draw his revolver from its holster and Stokes, who was standing but three feet away, shot him. Although wounded, Bond continued to struggle with Albert and Harry, and Stokes again fired at close range.

As Sergeant Bond started to sink toward the ground, Harry Wise, using the butt of his revolver as a club, viciously beat him about the face and head. Albert grabbed the sergeant's revolver from its holster and as he did so, the gun discharged, the bullet penetrating the sergeant's trousers but not entering his body. An autopsy subsequently performed disclosed the cause of death to be a "bullet wound in the chest with a right and left hemothorax." Two bullets were found, one in the chest cavity and the other in the sergeant's underclothing. Both bullets were identified as having been fired from the revolver used by Alfred Stokes.

With Bond thus disposed of, Stokes jumped behind the wheel of the police car and Albert and Harry entered from the other side. They drove rapidly out the main entrance of the dairy grounds and stopped opposite the place where Albert's Mercury was parked. There they abandoned the patrol car, entered the Mercury, and with Albert at the wheel, made their get-away.

They went through Irvington into Newark, where they stopped at Albert's girl friend's apartment to get a pair of shoes. They then proceeded to the Pulaski Skyway, crossed

the Hudson River at the Holland Tunnel and drove to the home of Lucille Wilbon in Springfield, Massachusetts, where Albert and Harry's brother, Joseph Wise, was staying.

While on their way to Massachusetts, they stopped at a service station to purchase a tire. Stokes went around the rear of the service station and threw the gun which he had used to kill Sergeant Bond into the woods, after first wiping it clean of fingerprints. It was subsequently recovered by the police, and ballistics experts testified that it was the murder weapon.

The three men arrived at the Wilbon home in Springfield at about 5 P. M. in the evening of February 21, 1954. There they met Joseph Wise and spent the night with him at the Wilbon house. Sometime during the evening, they split up the haul, Harry and Stokes each getting about $400 and Albert retaining the balance. They told Joseph Wise what had happened and gave him the remaining three revolvers, the old .32, the .22 and Sergeant Bond's .38, to dispose of. All of these guns were later recovered by the police.

The following day, the defendants, together with Joseph Wise, went to visit Ethel Wilson, a sister of the Wises, who was also living in Springfield. There they heard a radio broadcast reporting the fatal shooting of Bond. Later that night, the three of them and Joseph Wise and Lucille Wilbon drove to New York. Harry Wise and Stokes got out at Penn Station, and Albert returned to Springfield with Joseph and Lucille.

The next day, Sunday, Albert received a telephone call from Harry, who had returned to Roselle, advising him the police were looking for him. Albert decided to return to New Jersey, and that night he started back in the Mercury. While in Connecticut, his car was observed by a Connecticut state policeman, resulting in his being stopped and taken into custody.

On February 18, 1954 Harry Wise was arrested at his home in Roselle. Stokes, in the meanwhile, had fled to Farmville, Virginia, and was captured there on February 21, 1954.

## Point I.

*Was there error in denying the defendants' motion
for a change of venue?*

Neither the defendants' argument nor brief correctly outlines the procedural steps taken and the rulings made on the application for a change of venue.

Counsel in his brief, amongst other things, claims: "The published circumstances surrounding the crimes were repulsive to the community's conscience," and "Reports of the murder and subsequent apprehension of the defendants appeared daily in bold headlines in the press." "An editorial in the newspaper with the largest circulation in the county deplored the crime and assumed the guilt of the defendants." "Grand jury resolutions and resolutions of the Township of Union praising those responsible for the apprehension of the defendants and assuming their guilt were published in the press." "Special precautions had to be taken by the county sheriff to handle the spectators at the trial * * *." "The Bond murder had become a household term in Union County."

These are some of the facts and circumstances impelling counsel to place their cause within the pronouncement made in *Shepherd v. State of Florida*, 341 *U. S.* 50, 51, 71 *S. Ct.* 549, 95 *L. Ed.* 740 (1951), where it was held the trial procedure was "but a legal gesture to register a verdict already dictated by the press and the public opinion which it generated."

The record, however, reveals the following: on April 2, 1954 an application was made before the assignment judge under *R. R.* 3:6–2(*a*) and (*b*) for proofs to be taken for a change in venue. That rule specifically states:

"All applications for change of venue or trial by foreign jury in criminal trials shall be made to the Assignment Judge of the county in which the indictment was found. * * *"

And:

"Whenever, in the opinion of the court, a fair and impartial trial cannot be had in the county in which the indictment was found * * * the court shall order a change of venue."

Finally:

"The proofs shall be made in such form as the court may direct."

Counsel inquired of the court "what form the proofs shall take upon our application." The court directed: "I am going to set a date for the hearing of the taking of proofs, which will be oral evidence taken by testimony in open court before me Tuesday, April 6, 10 o'clock A. M." This date was subsequently changed to Wednesday, April 7, at the same hour.

Dissatisfied with the dispatch evidenced by the lower court, counsel appealed to the Appellate Division, seeking further time. The motion was denied, the court in effect saying it was a matter of discretion for the assignment judge.

Counsel thereupon appeared again before the assignment judge on April 7, 1954 and bluntly advised the court that under the circumstances "we are not prepared this morning to move unless your Honor in your discretion will give us at least two weeks to put our proof—to put in our proof. We are not prepared to move this morning." Whereupon the court announced: "No proof being offered, the motion to change the venue is denied." Despite the denial, however, the court then advised counsel: "I will be available— I will make myself available for the period of two days, if necessary three days, during the Easter vacation period in the event counsel wish to offer proofs at that time. * * * If, however, they wish now to say that even that would be too short a time, I would then make my ruling definite and deny the motion for change of venue." Mr. Mantel: "On behalf of the three defendants, we say that the time is too short." The court then ruled: "The record will also show the court's offer and availability during the Easter recess the days of the 12th, 13th and 14th of April and counsel's attitude and the statement that even that time would be too short and therefore no proof will be offered. Under those circumstances, I think it is just and I so order that the motion for change of venue is denied."

A formal order to this effect was entered. The defendants never availed themselves of the opportunity given by the court to be heard further in the matter.

On May 17, 1954, on a motion for an adjournment or postponement before the trial court, counsel called the court's attention to and marked in evidence a number of resolutions passed by the grand jury of Union County highly laudatory and lavishly praising the officials active in the apprehension and arrest of the defendants and informed the court there were a number of articles in the various newspapers constituting widespread publicity from the date of the murder on February 12 up to the present time. There were also offered two resolutions adopted by the Township of Union. This was the sum and substance of what counsel relied upon for a change of venue as well as a postponement of trial. The principal objection, as stressed by counsel, to the resolutions and newspaper articles was their constant assumption of the guilt of the defendants.

It was urged: "This publicity endangers the right of a fair trial. It encourages a trial by publicity instead of a trial by jury." Counsel then adroitly renewed their application for a change of venue, coupling it with the other relief being sought.

The court, in denying the motion for delay, said:

"It seems to me that every case involving alleged murder is an important news item and of necessity receives widespread publicity. Everything done in open court is naturally a matter of public concern and will receive widespread publicity in connection with a case of this type.

The resolutions of the Grand Jury will not be admissible in evidence during any trial of this case and cannot even be commented upon, and the same is true of the other resolutions that might have been passed.

The resolutions, true, have been published but also other news items involving this particular case. Each prospective juror may be questioned as to whether or not he has formed an opinion as to the guilt or innocence of the defendants. If he states that he has formed an opinion as to the guilt and that he will not decide the case on the evidence, or that his opinion is based on malice or ill-will, that prospective juror may be challenged for cause.

Furthermore, the jury will be instructed to be guided solely by the evidence and the charge of the Court, which will include instructions that the defendants are presumed to be innocent until the State proves them guilty beyond a reasonable doubt.

The jury will be further instructed, as are jurors in other cases of this type, that they are to be guided only by the evidence and not to be influenced by what they may have heard or read with reference to this case.

I have seen no evidence of any inflamed public sentiment against these defendants."

We quote the court *in extenso* because subsequent developments proved the wisdom of its observations.

There is nothing in the record as we search it giving the slightest justification for counsel's charge in his brief that the defense was never given an opportunity "to demonstrate to the court the full frenzy to which the population of Union County had been whipped up by the crime and the publicity given to it."

We freely subscribe to the basic concepts of fairness as dedicated in *Shepherd v. State of Florida, supra,* holding newspapers, in the enjoyment of their constitutional right, may not deprive the accused of his right to a fair trial, and requiring the due process clause to be realistically and honestly interpreted and observed. But we find nothing in the proofs submitted in the instant case bringing it within the prohibited orbit.

Our courts, too, in the same spirit of fundamental fairness, have decreed that motions for a change of venue are addressed to the sound discretion of the court. The discretion employed must be neither arbitrary, vague nor fanciful but must be guided by and in consonance with well established principles of law. *In re Longo,* 124 *N. J. L.* 176, 181 (*E. & A.* 1940); *La Bell v. Quasdorf,* 116 *N. J. L.* 368, 372 (*Sup. Ct.* 1936).

The test is whether an impartial jury could be obtained from among the citizens of the county or whether they are so aroused that they would not be qualified to sit as a jury to try the case. The evidence submitted, to be controlling, must be clear and convincing proof that a fair

and impartial trial cannot be had before a jury of the county in which the indictment was found. *State v. Overton,* 85 *N. J. L.* 287 (*E. & A.* 1913); *State v. Lynch,* 103 *N. J. L.* 64 (*E. & A.* 1926); *In re Kelsey,* 127 *N. J. L.* 568 (*Sup. Ct.* 1942); *State v. Collins,* 2 *N. J.* 406 (1949); *State v. Cooper,* 10 *N. J.* 532 (1952).

Applying the rule firmly established by many adjudications to the facts before us, we reflect again upon the comments of the trial court in which it prophesied that the extent of the influence, if any, of the publications and the documents complained of would be clearly evidenced when the prospective jurors were inquired of as to their qualifications to sit at the trial to determine the guilt or innocence of the accused.

Although the defendants, under *R. R.* 3:7-2(*c*), were entitled to exercise 30 peremptory challenges, they actually, by the record, exercised only 17 of such challenges: Albert Wise, 5; Harry Wise and Alfred Stokes 6 each. In addition to their peremptory challenges, they presented 14 challenges for cause, of which 9 were granted.

This, in substance, meant that the 14 jurors finally selected had not been challenged in any manner whatsoever, nor was there an objection made to any one of them as being a trier of the facts in the case to be submitted to them. The general panel of prospective jurors was not exhausted when the defense expressed their complete satisfaction with the jury as it was finally selected. Their conclusion in this regard was again admitted on oral argument.

Under these circumstances, we see no error, nor do we find a failure to comply with the true concept of essential fairness as we conceive it in denying the motion for a change of venue.

█ Although we find no error in this regard for the reasons already expressed, we must comment with considerable vigor, so there will be no repetition of it, upon the resolutions returned by the grand jury referred to in the motion addressed to the court. There is absolutely no authority in the grand jury to issue or publish such resolutions.

■ The grand jury is limited to returning indictments or presentments, and when this occurs, they should be returned and controlled as provided for by our rules. Indictments are to be handed up directly to the court, pursuant to *R. R.* 3:3–8, and presentments are returned to the court under *R. R.* 3:3–9. The assignment judge may receive the presentment in whole or in part or decline it *in toto*. *In re Camden County Grand Jury*, 10 *N. J.* 23 (1952).

### Point II.

*Was there error in refusing an adjournment?*

■ Intimately related to the motion for a change of venue is the argument contending not enough time was allowed to prepare and present the motion itself.

When the motion was made on April 2, 1954, the assignment judge set April 7 as the date for the submission of proof. Although the defendants say this was insufficient time, admittedly it was adequate for them to appeal without favorable results to the Appellate Division.

They appeared on the last date before the assignment judge without proofs and asked further time. It was granted, the judge advising he would be available for that purpose April 14, which was nearly two weeks from the date of the original application. But it is contended the short date substantially prejudiced the defendants.

Unseemingly and prejudicially unnecessary haste is not conducive to the equitable and proper administration of justice, but the factual situation here existing does not come within these prohibitions.

Twelve days to prepare proofs showing justification for a change of venue seems not too limited, especially when counsel in a summary manner tersely state in open court that the time is too short but do not inform the court in what respect they are unable to comply or what proof they are attempting to secure or how they would be prevented from obtaining it by reason of the time limitation. The record

shows the defendants failed to produce before the assignment judge a single witness, a single affidavit or a scintilla of evidence to substantiate their contention.

Nor is there presently before us any persuasive proof that the time offered to present the proofs on this motion was insufficient. Such matters are within the sound discretion of the trial court and their denial will not lead to a reversal unless it appears the defendants suffered manifest wrong or were prejudiced. *State v. Lynch, supra; State v. Juliano,* 103 *N. J. L.* 663 (*E. & A.* 1927); *State v. Zied,* 116 *N. J. L.* 234 (*E. & A.* 1936).

Our conclusion is further fortified by what transpired more than a month later when on May 17, 1954 counsel renewed their application for a change of venue to the trial court.

The only evidence they offered was a copy of the six resolutions already referred to passed by the grand jury, plus two resolutions adopted by the Township of Union and excerpts from various newspaper articles concerning the crime and its participants. There is nothing demonstrating that these documents and clippings could not have been presented within the time limits originally set by the assignment judge. In fact, the contrary seems well established by the record when it reveals the limited proof upon which counsel intended to rely.

## Point III.

*Was there error in refusing to dismiss the indictments?*

Relying upon the dissemination and publication of the same resolutions already referred to, counsel contend the court should have granted a motion to dismiss the indictments because (1) it was impossible to obtain a fair trial; (2) the guilt of the defendants was prejudged prior to the trial; and (3) the law that an indictment is not proof of guilt was nullified.

It seems aphoristic that if the proof submitted would not suffice for a postponement or a change of venue as we have already decided, it could not possibly operate as a complete

exoneration of the charge of murder lodged against the defendants.

## POINT IV.

*Did the court err in reference to its rulings on the testimony of Joseph Wise?*

Joseph Wise, a brother of the two defendants, had been confined to the Union County Jail for approximately 15 weeks as a material witness under substantial bail. He was arrested in Springfield, Massachusetts. When asked about the details of his conversation and the admissions made by the defendants after their arrival in Springfield, he developed a marked lapse of memory. The prosecutor pleaded surprise and advised the court he was about to neutralize the witness' testimony by proving contrary prior utterances.

This process was proceeded with and is justified by *State v. D'Adame*, 84 *N. J. L.* 386, 397–398 *(E. & A.* 1913); *State v. Foster*, 89 *N. J. L.* 45, 48 *(Sup. Ct.* 1916); *State v. Cooper*, 10 *N. J.* 532, 558, 562 (1952).

The witness was asked whether he did not recall testifying to a contrary effect before the grand jury, giving the details of his conversation with the three defendants relative to the hold-up and the shooting at the Tuscan Dairy on the morning in question.

His reluctance to give incriminating testimony against his two brothers is understandable, but it should not be permitted to thwart the obligation of the State to prosecute relentlessly those who commit murder within our jurisdiction.

Following the prodding and the refreshing of the witness' memory by the course already referred to, the court recessed for the day. The next day, without the prosecutor's being required to prove any further contradictory statements made by the witness, the witness recanted his previous testimony, attributing his poor previous recollection to the fact that no notice had been given him of the fact he was to testify. Without any prompting, he testified fully and freely as to the conversation had with the defendants and their respective

admissions to him. He was not led or guided by the prosecutor.

Counsel contends: "The admission of such testimony tends to support the faltering testimony of a discredited, impeached or perjured witness and defeats the ends of justice."

We cannot subscribe to this view. See *State v. Guida*, 118 *N. J. L.* 289 (*Sup. Ct.* 1937), affirmed 119 *N. J. L.* 464 (*E. & A.* 1938). What was done is justified by many decisions recorded in our books and was adequately and properly covered in the court's charge when it said:

"Naturally, there is an apparent conflict between some of the testimony that Joe Wise gave on the first day and some that he gave on the second day, and it is up to you to decide which is the truth. The testimony of Joe Wise is to be taken as a whole from the beginning to the end, that is, from the beginning of his testimony on the first day to the conclusion of his testimony on the second day, and the jury are at liberty to believe such part of it as you see fit and to reject such part as you see fit. You must apply your experience and common sense to the situation. You are the ones who must decide under all the facts and circumstances in the case which part of Joe Wise's testimony is true and which part is not true."

Additionally, the testimony of Joseph Wise was in accord with all of the other testimony in the case, including the admissions made by the defendants themselves in their respective statements, and we see no prejudicial error in the disposition of this phase of the trial by the trial court.

Nor is there error in the elimination of the word "neutralize" in the fifth request to charge and in the refusal to charge the sixth request as made by the defendants.

## POINT V.

### *Were the confessions admissible in evidence?*

The basic rule as to the admissibility of confessions has been written many times. The primary inquiry in determining its admissibility is whether or not it was voluntary. Whether it was voluntary depends upon the facts in each case.

■ Its competency is primarily for the trial judge, while the weight to be given it is determined by the jury. The determination of the trial court will not ordinarily be disturbed on appeal where there is sufficient evidence to support it.

The adjudications so holding are abundant under our judicial system provided for by the Constitution of 1947, as well as prior thereto. *Roesel v. State*, 62 *N. J. L.* 216 (*E. & A.* 1898); *State v. Young*, 67 *N. J. L.* 223 (*E. & A.* 1902); *State v. Hand*, 71 *N. J. L.* 137 (*Sup. Ct.* 1904); *State v. Foulds*, 127 *N. J. L.* 336 (*E. & A.* 1941); *State v. Cole*, 136 *N. J. L.* 606 (*E. & A.* 1948), *certiorari* denied 334 *U. S.* 851, 68 *S. Ct.* 1503, 92 *L. Ed.* 1773, rehearing denied 334 *U. S.* 862, 68 *S. Ct.* 1519, 92 *L. Ed.* 1782; *State v. Pierce*, 4 *N. J.* 252 (1950); *State v. Bunk*, 4 *N. J.* 461 (1950), *certiorari* denied 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615; *State v. Grillo*, 11 *N. J.* 173 (1952), *certiorari* denied 345 *U. S.* 976, 73 *S. Ct.* 1123, 97 *L. Ed.* 1391; *State v. Vaszorich*, 13 *N. J.* 99 (1953), *certiorari* denied 346 *U. S.* 900, 74 *S. Ct.* 219, 98 *L. Ed.* 400; *State v. Auld*, 2 *N. J.* 426 (1949); *State v. Cooper*, 2 *N. J.* 540 (1949); *State v. Cooper*, 10 *N. J.* 532 (1952); *State v. Tune*, 13 *N. J.* 203 (1953); *State v. Walker*, 15 *N. J.* 485 (1954); *State v. Beard*, 16 *N. J.* 50 (1954); *State v. Tune*, 17 *N. J.* 100 (1954), our latest decision embodying these principles being *State v. Rios*, 17 *N. J.* 572 (1955).

In the instant case the truth of the confessions is not in dispute. Not only are they factually accurate, but the record portrays the defendants endeavored on several occasions to enter pleas of guilty to the indictments returned against them, thus avoiding the imposition of the death penalty. The issue presented, rather, turns upon the single ground that the statements were not voluntarily given and the assertion that the State trespassed upon the doctrine of fundamental fairness.

In this regard, there are submitted a number of federal cases: *Haley v. State of Ohio*, 332 *U. S.* 596, 68 *S. Ct.* 302, 92 *L. Ed.* 224 (1948); *Watts v. State of Indiana*, 338 *U. S.*

49, 69 *S. Ct.* 1347, 93 *L. Ed.* 1801 (1949); *Harris v. State of South Carolina*, 338 *U. S.* 68, 69 *S. Ct.* 1354, 93 *L. Ed.* 1815 (1949); *McNabb v. United States*, 318 *U. S.* 332, 63 *S. Ct.* 608, 87 *L. Ed.* 819 (1943); *Lisenba v. People of State of California*, 314 *U. S.* 219, 62 *S. Ct.* 280, 86 *L. Ed.* 166 (1941); *Leyra v. Denno*, 347 *U. S.* 556, 74 *S. Ct.* 716, 98 *L. Ed.* 948 (1954). We have also examined *U. S., ex rel. Caminito v. Murphy*, 222 *F. 2d* 698 (*2d Cir.*, decided May 11, 1955), which contains perhaps the most recent expression by a federal appellate court of the principles underlying the admissibility of confessions.

Most of these and many other federal cases were considered, analyzed and commented upon at length in *State v. Pierce, supra,* where we noted the various sets of factual developments, when taken in their entirety, were found by the federal court to have created a state of coercion and duress sufficient to invalidate the resulting confessions. We concluded in *State v. Pierce, supra,* 4 *N. J.,* at *page* 261:

"The fear that arises out of a consciousness of guilt and a dread of the legal penalty which probably will and ought to fall is not the kind that will invalidate an otherwise voluntary confession."

In *State v. Cooper, supra,* 10 *N. J.,* at *page* 552, we expressed it:

"The state of mind which renders such a statement involuntary and hence inadmissible is that induced by mistreatment, threats, promises, physical or mental abuse which deprives an otherwise rational mind of the exercise of its free will and powers of decision and discernment. It is not that mental condition which arises from an inner sense of wrongdoing and fear of its consequences."

With these basic principles in mind, we turn to a detailed consideration of the circumstances surrounding the confessions which were received in evidence in the case *sub judice.*

### A. The confession of Albert Wise.

Albert Wise was the first of the defendants to be apprehended by the police during the investigation of Ser-

geant Bond's murder. He was arrested at about 8 P. M. on Sunday evening, February 14, while enroute from Springfield, Massachusetts, to New Jersey and was taken to the Connecticut State Police Barracks at Bethany, Connecticut. He was questioned briefly by the police and confined in a cell for the remainder of the evening and until breakfast on the morning of February 15.

According to Albert's testimony, his first contact with any members of the Union Township Police Department came shortly after breakfast on the morning of February 15, when he was questioned for about an hour by Chief Lombardi, Sergeant Kitchell and Detective Spies. He was returned to his cell for the rest of the day and shortly after dinner that evening he was driven to the Union Township Police Station in the custody of police officers, arriving there at about 10:30 P. M. After being questioned briefly, at about midnight he was placed in a police line-up.

Albert declares that commencing immediately after the line-up until he gave his statement sometime after dinner on Friday evening, February 19, he was subjected to almost continuous interrogation by various members of the Union Township Police Department, principally Lombardi, Spies, Kitchell, Ebert and Reiss, and was slapped in the face or beaten about the chest and stomach on at least five occasions by Detective Ebert. He said all the beatings were administered to him in a basement room at the police station, and on one occasion he was made to stand against a wall with his legs spread apart and his hands behind his head with a spotlight glaring in his face. Ebert, he said, told him on Thursday, February 18, that he would get a confession out of him or "kill him."

On Friday he was left alone in his cell for most of the day and after dinner was confronted by his brother, Joseph Wise, who informed him Harry had confessed and that he himself had told the police all he knew. Shortly afterward, Albert testified Ebert approached him and told him he might as

well confess too, and if he did so, he would be given no more than 10 to 12 years. Not long afterward, Albert was taken to the detectives' room, where he gave his statement to the police.

After the confession had been typed and signed by Albert, he said he told the county prosecutor he had been promised he would be given consideration and the prosecutor said that no one had authority to do so.

To support his version of the events leading up to the confession, Albert produced one witness, his uncle, Caleb Oglesby, who testified he had seen Albert on Thursday, the 18th, in a cell block at the station house and that Albert had complained of pains in his chest and of being so sore he could not sit down.

This testimony was vigorously rebutted by the State. It produced Chief Lombardi, Sergeant Kitchell, Detectives Ebert, Reiss, Spies and Trimborn, all of whom denied ever having slapped, punched, beaten or in any other way maltreated Albert Wise during his confinement at the Union Township Police Station. Ebert also denied ever having made any threats or promises in connection with Albert's confession.

The State also produced Trooper Kane of the New Jersey State Police, who administered a lie detector test to Albert on Thursday, February 18. Kane testified he had asked Albert whether he had been abused in any way by the police and Albert had replied in the negative.

Dr. George Kempe, a physician, was called by the State. He testified he had examined Albert in his cell at the police station in the morning and in the evening of February 18, and again on Saturday, February 20. He gave Albert a thorough physical examination and discovered no signs of bruises or physical injuries, other than a first-degree burn on Albert's face, which concededly Albert had had prior to having been taken into custody. According to Dr. Kempe, Albert appeared to be quite nervous and his heart beat was fast. After his first examination on Thursday, he treated the burn on Albert's face, and after the second examination

he gave him a bromide, a mild form of sedative, to calm him. At no time did Albert complain to him of having been beaten by the police.

The State also called Father Begley, a priest, who was present as an impartial witness at the signing of Albert's confession, having been called there for that purpose by the county prosecutor and the police. He testified Albert was given a typewritten statement and that he read aloud and initialed the first four or five pages. Then Albert said: "I don't want to read any more," and Chief Lombardi asked him whether he would consent to his reading the statement. Albert agreed and Chief Lombardi read the next four or five pages. He then asked Albert to resume reading the statement, and at that point Albert told him he had been promised consideration in return for making the statement. The witness' own words best describe what happened afterward:

"That caused discussion among the police officers. They wanted to know who had told him this, and he said some of the police officers. As far as my recollection goes, they were not identified by name. Prosecutor Morss told the defendant that no one had any authority or power to make such a promise, that it was entirely out of their field of duty, and that their duty was to apprehend and to punish those who committed crime and not to give consideration.

Then Albert continued to read and he read from there on in a low tone, but clearly enough to be heard in every way by me.

I would say that he was calm, in good condition, in full possession of his faculties, perhaps under a little strain, which perhaps would be natural enough."

Albert was arraigned before a magistrate during the morning of February 20.

In substance, Albert Wise contends he was not arraigned before the nearest magistrate without unnecessary delay as required by our rules; he was questioned extensively without being given an opportunity to rest and repair; he was assaulted by the police on various occasions, and was promised leniency.

His counsel in his brief asserts: "The constant beating and persistent questioning of this defendant forced him into

a confession. Brutal treatment should be reason enough for exclusion regardless of the apparent truthfulness."

Obviously realizing, however, the infirmity of his own factual position, counsel admits: "It is very unlikely that any trial court would exclude a confession where the evidence will be conflicting on the issues of voluntariness." This was exactly the reaction of the trial judge in the instant case.

Analyzing the testimony most favorable to the defendant, the result is practically an uncorroborated story of physical force and coercion vehemently denied by every police official active in the interrogation, amply supported by the physician who attended him and further fortified by a priest, an impartial witness whose fair and unprejudiced version of what he saw and heard impresses merely with the reading of his utterances.

The delay in arraigning, if there was any, is not fatally defective in itself, but as was said in *State v. Pierce, supra:*

"Whenever there has been any undue delay in taking an arrested person before a magistrate, in violation of our rule, careful scrutiny will be given to the conditions under which a statement was taken from him during the period of delay and such a statement will be admitted in evidence only when it convincingly appears that it was in fact and in truth voluntarily made."

Regardless of what rule the United States Supreme Court has evolved for the purposes of the federal judicial system, see *McNabb v. United States*, 318 *U. S.* 332, 63 *S. Ct.* 608, 87 *L. Ed.* 819 (1943), almost every state court which has been called upon to decide this question has held that confessions are not inadmissible merely because they are obtained from one who is illegally in custody, but are admissible if otherwise voluntary. *People v. Vinci*, 295 *Ill.* 419, 129 *N. E.* 193 *(Sup. Ct.* 1920); *State v. Raftery*, 252 *Mo.* 72, 158 *S. W.* 585 *(Sup. Ct.* 1913); *Balbo v. People*, 80 *N. Y.* 484 *(Ct. App.* 1880); 2 *Wharton, Criminal Evidence* (11th ed. 1935), § 610. The illegality of the custody is but another factor to be considered in determining whether the confession

is voluntary. *People v. Elmore,* 277 *N. Y.* 397, 14 *N. E.* 2d 451, 124 *A. L. R.* 465 (*Ct. App.* 1938).

As to the promised leniency, the record clearly shows that when the prisoner claimed its existence he was informed no one was in a position to make such a promise and he would not receive any benefit by signing his statement. Additionally, he was so warned by the prosecutor. That he entertained no such thought is quite apparent from the remark attributed to him after the signing of his statement: "I just gave you my death warrant."

Furthermore, even if the prisoner's version of the physical applications were believed, it is nevertheless quite obvious from the record that these methods never succeeded in producing the questioned confession. The evidence shows implicitly it was forthcoming because his brother informed him that Harry had confessed and he too had told the authorities "all he knew." The futility of further protection by silence could not have been more effectively demonstrated, and with a consciousness of the dilemma so created, the prisoner capitulated and admittedly told the truth, no more, no less.

Applying the rules already enunciated, we see no error in the admission of the confession.

## B. *The confession of Harry Wise.*

Harry Wise was taken into custody by the Union Township Police at 3:30 P. M. on Thursday, February 18, at his home in Roselle, New Jersey. Shortly before his arrest, he had called the Union Township Police and asked whether they wanted to question him, and upon being told they did, he advised them they could pick him up at his home.

Immediately after his arrival at the Union Township Police Station, he was questioned about his connection with the shooting of Sergeant Bond. He testified he was handcuffed and made to stand against a wall in an upstairs room at the station house, and while in that position, Detective Ebert shoved the handcuffs up his arms in a painful manner

and then proceeded to kick him in the groin, punch him in the stomach and slap him in the face. He was thrown on the floor, picked up and placed in a chair, whereupon Detective Ebert commenced cursing him. Chief Lombardi and Sergeant Kitchell entered the room and told Ebert to loosen the handcuffs. Lombardi asked him if he would like to make a statement and he replied affirmatively. A pen and paper were furnished to him and he commenced writing out a confession in his own hand.

At the trial, when asked why he gave the statement, Harry said:

"Well, when I got there—I decided anyway, before I got there, and that's the reason why I came home. I was going to turn myself in anyway. * * * I was going to turn myself in anyway, and so Mr. Lombardi told me that I might go make up a statement because, 'We already know about it,' and I started to make up this statement about five minutes after."

There is little doubt from the record before us that at the time of his arrest Harry Wise was a narcotics addict. He testified he had had a "bag and a half" that morning and had been taking it regularly for a period of three years. While he was writing out the statement, he said he felt pain in his stomach and became dizzy—which apparently are symptoms normally associated with an addict's "withdrawal" from narcotics. He claimed he told the police officer he was a dope addict and that he was suffering from "withdrawal." According to Harry, he was unable to continue writing out the statement and remembered nothing that occurred thereafter, although he did remember being given an injection by a doctor sometime later. He said that when he came to, he found himself riding with police officers in a car headed toward Springfield, Massachusetts.

Harry called as an expert witness in his behalf a psychiatrist who had had considerable experience in the field of narcotics addiction. The expert testified that during the "withdrawal" stage an addict will not be able to think clearly, will lack discernment and will be unable to make wise decisions.

Harry also called as his witness Dr. Kempe, who had examined him on three occasions on February 18 at the police station, the first time at about 6:30 P. M., again at 8:30 and the last time near midnight. He testified that on the occasion of the first examination, he found Harry to be nervous and sweating, although he was fully capable of answering his questions. The doctor testified, based upon his observation of Harry at 6:30 P. M., that Harry's mental faculties were not impaired and he was well oriented. A police officer told him Harry was a heroin addict and the doctor gave him an injection of metrazole and morphine, a stimulant. Harry's condition otherwise was satisfactory.

The second time he examined Harry at 8:30 P. M. that evening he found him sweating and under nervous tension and again gave him an injection of morphine. When asked whether Harry was in full possession of his mental faculties at this time, the doctor replied affirmatively.

At 11:45 P. M. the same evening, he was called to the police station and upon examining Harry, found him to be in "very nervous tension" and sweating. His eyes and his nose were running and his pupils were dilated. On this occasion he again gave him an injection of metrazole and morphine and advised the officer in charge that Harry should be removed to a hospital.

Harry entered the Elizabeth General Hospital at 12:45 A. M. on February 19, and the hospital records and the testimony of the attending physician and the nurses disclose that he complained of abdominal pains and had "tremors of hands and lips." He was given injections of phenobarbital and at one point during the night appeared to be in agony. However, he later fell asleep.

The following day, Friday, he had breakfast and rested quietly. He was discharged from the hospital at 1:20 P. M. in the custody of the police.

The State's version of the events leading up to Harry's confession differs sharply from the defendant's recital. Sergeant Kitchell testified Harry arrived at the Union Township Police Station at about 3:30 and he appeared normal

at the time. They began questioning him and while doing so Kitchell received a telephone call from Detective Reiss, who was then in Springfield, Massachusetts, advising him that evidence had been discovered there implicating Harry and Albert Wise and Stokes. Kitchell said that following the telephone conversation he confronted Harry with this information and Harry announced he would give him a statement. He requested paper and pencil to write out the statement and proceeded to do so. He wrote for about a half hour and when, according to Kitchell, they decided he was not furnishing sufficient detail in his written statement, they brought in a stenographer to take down a statement in question and answer form. This statement commenced at about 5:07 P. M.—a little more than an hour and a half after Harry arrived at the police station—and was concluded at about 6 P. M.

Afterward, Harry appeared to be sick and Dr. Kempe was sent for. By that time Harry was in his cell and the police stenographer was putting the statement in typewritten form. Harry remained in his cell for the rest of the evening of February 18 until he was taken to the hospital. Apparently, he was not asked to sign the typewritten confession at any time that night.

The following day, after Harry's release from the hospital, he was requested by the police to reenact the events which had occurred on the morning of February 12. He directed the police officers along the route which had been taken by the defendants to the Tuscan Dairy, and at the dairy pointed to locations where various events had occurred on that morning. He was then returned to police headquarters, where he was presented with his confession, which he read and signed, after making several corrections in the transcription.

After signing the confession, he identified the guns which were used during the hold-up, which had been recovered by the police, and the keys which Albert had taken from the safe. At 4 P. M. that afternoon he was returned to the hospital.

The basic objection to Harry Wise's confession was that at the time he made it "he was suffering from severe symptoms of withdrawal from narcotics addiction."

Counsel for Harry Wise, citing *Lisenba v. People of State of California*, 314 *U. S.* 219, 62 *S. Ct.* 280, 86 *L. Ed.* 166 (1941), and *Leyra v. Denno*, 347 *U. S.* 556, 74 *S. Ct.* 716, 719, 98 *L. Ed.* 948 (1954), ruling the defendant must have "mental freedom 'to confess to or deny a suspected participation in a crime,'" plus *State v. Cooper*, 10 *N. J.* 532, 552 (1952): "The state of mind which renders such a statement involuntary and hence inadmissible is that induced by mistreatment, threats, promises, physical or mental abuse which deprives an otherwise rational mind of the exercise of its free will and powers of decision and discernment," contends in his brief: "In view of the fact that at least some pressure—and the defense contends that it was an overwhelming amount—was exerted, this court must determine whether the defendant possessed the 'free will and powers of decision and discernment,' the capacity for 'expression of free choice,' 'the mental freedom to confess or deny a suspected participation in a crime' which would render it voluntary."

Much reliance is placed upon the testimony of the defense's medical expert, a specialist in psychiatry and neurology who, answering a hypothetical question, said the prisoner's condition would not indicate the confession was purely voluntary although it was "automatic in compliance."

However, Dr. Kempe, while not an expert in the field of narcotics addiction, actually observed Harry on three occasions and in his opinion there was nothing wrong with the prisoner's mental condition, his mind was clear and well oriented, and he was in full possession of his mental faculties. Lay witnesses testified to the same effect. Dr. Baruch, on his observations, concluded the prisoner was capable of giving a voluntary statement, while Schlossberg, a veteran of 25 years' experience with narcotics traffic, found no evidence that the defendant was a narcotics addict and likewise found him in full possession of his mental faculties.

Counsel for the prisoner in his brief says: "The question as to whether a person under the influence of narcotics is legally capable of making a voluntary confession is a novel one in the New Jersey courts," while the State in its brief says, in reference to the same question: "Not only is there a dearth of precedent in this State but there is very little precedent in the entire United States."

This problem has been encountered and disposed of in *People v. Kent,* 41 *Misc.* 191, 83 *N. Y. S.* 948, 949 (*Sup. Ct.* 1903). The defendant there, under charge of homicide, gave a statement to the coroner and others at a hospital while under the influence of narcotics. In denying the application for a certificate of reasonable doubt, the court said:

"The fact that the defendant was under the influence of drugs or liquor, which affected his recollection, did not make his declarations inadmissible or incompetent. It simply affected his credibility, and the weight to be given to his statements by the jury. * * * He may have been under the influence of drugs and liquor to such an extent as to have been unconscious of what his words meant, or he may only have been excited by the drugs and liquor, and yet possessed of his reason and judgment. These were questions of fact for the jury, and were properly submitted for their consideration."

Closely analogous to the case *sub judice* is *People v. Waack,* 100 *Cal. App. 2d* 253, 223 *P. 2d* 486, 489 (*D. Ct. App.* 1950). There the defendant confessed he was an "addict" and his victim. a prostitute in his employ, was a "user." A police officer testified the defendant had stated he took a "shot" of heroin shortly before his arrest and admitted that at the time of his confession the defendant appeared to be under the influence of a narcotic. A second statement was taken when the defendant appeared to be suffering from the effects of "withdrawal symptoms." In affirming the conviction, the court said:

"* * * The question is not whether the defendant was suffering from the effects of a narcotic when the statements were taken, but whether such statements were freely and voluntarily given by defendant at a time when he knew and understood what he was saying. * * * This was a question of fact for the trial court. * * *"

In *People v. Duncan, 72 Cal. App. 2d 247, 164 P. 2d 313,* 316 (*D. Ct. App.* 1945), the defendant had taken an overdose of seconal in an attempt to commit suicide. He gave a murder confession the following day from his hospital bed after he came out of a coma. At the trial, however, he claimed he could remember nothing of having given a confession. In passing upon his contention that the confession was inadmissible, the court said:

"In essence all that is said in argument on the point goes to the weight of the evidence, and not to its admissibility."

 Although there appear to be few reported cases involving the admissibility of confessions given while the defendant was under the influence of narcotics, we think it is apparent the same principles apply to this class of cases as have long been applied to confessions made while under the influence of intoxicating liquor. In the latter class of cases, both the state and federal courts are in unanimous agreement that the intoxication of the accused at the time he confesses affects only the weight of the confession as evidence against himself. So long as the accused is capable of making a narrative of past events or of stating his own participation in the crime, his statements are admissible against him. *State v. Grear, 28 Minn. 426, 10 N. W. 472* (*Sup. Ct.* 1881); *White v. State, 32 Tex. Cr. 625, 25 S. W. 784* (1894); *Eiffe v. State, 226 Ind. 57, 77 N. E. 2d 750* (*Ind. Sup. Ct.* 1948); *Bell v. United States, 60 App. D. C. 76, 47 F. 2d 438, 74 A. L. R. 1098* (*D. C. Cir.* 1931); *Morton v. United States, 79 U. S. App. D. C. 329, 147 F. 2d 28, 31* (*D. C. Cir.* 1945), *certiorari* denied *324 U. S. 875, 65 S. Ct. 1015, 89 L. Ed. 1428* (1945); *Bell v. United States, 60 App. D. C. 76, 47 F. 2d 438, 74 A. L. R. 1102;* 18 *L. R. A., N. S.,* 789; *Underhill, Criminal Evidence* (2d ed. 1910), § 136.

 The confession itself bears witness to the fact that at the time he made it Harry was in full command of his senses. The document is 21 pages long and in it Harry

accurately related—as proved by the State's corroborating evidence and the confessions of his accomplices—every detail of the events which occurred on the morning of February 12 and his participation in them. Before signing the document, he made no less than 11 corrections in the transcription, a performance incompatible with a mind devoid of discernment or a will of its own.

Even if we ignore all of the other evidence which undermines the validity of Harry's present position, there would still remain his own testimony at the trial that "I decided anyway, before I got [to the police station] * * * I was going to turn myself in * * *," by which he plainly meant he had decided to confess. According to the prisoner's version of what transpired, that decision was made long prior to the time he went into the so-called "withdrawal" stage and under any view was a voluntary act.

Accordingly, we fail to see any basis upon which the trial judge could have ruled otherwise than as he did in admitting the confession into evidence for consideration by the jury.

## C. The confession of Alfred Stokes.

Alfred Stokes was arrested late in the evening of February 21, 1954, while he was sitting in the kitchen of his aunt's house in Farmville, Virginia. The arrest was made by Detectives Spies and Reiss in company with Farmville police officials. He was taken to the local station house, where he was questioned briefly, and then confined in a cell.

The following morning, February 22, he was brought before a local magistrate, where he waived extradition and consented to return to New Jersey on the basis of the New Jersey warrant which the police officers had brought with them.

Shortly after noon that day, as Detective Spies was walking with Alfred toward the police car which was to return him to New Jersey, Alfred wrenched himself from the grasp of Detective Spies, and although handcuffed, ran off. Spies yelled at him to stop and fired a warning shot in the air.

Alfred, however, paid no heed to the warning, and Spies and the local police chief, who was also present, fired at him, one bullet finding its mark and wounding Alfred in the hip.

He was taken to a local hospital, examined, X-rayed, given an anti-tetanus injection, and his wound was dressed. The doctor in charge advised that although the bullet was still in Alfred's hip, it would be all right to transport him back to New Jersey in that condition. He gave Detective Spies a slip authorizing Alfred's discharge from the hospital.

From Farmville Spies and Reiss took Alfred by car to National Airport at Alexandria, Virginia, where they arrived at about 5 P. M. and were met by Chief Lombardi, Detective Martel and Sergeant Kitchell. While in the car he was advised Harry and Albert had already confessed, and he was questioned by Lombardi as to his participation in the crime. In response to his questions, Alfred gave Lombardi a statement which eventually became part of his confession offered at the trial.

The party then left National Airport and journeyed by automobile to Union Township, arriving there at about 10:45 that evening. Alfred was taken to the detectives' room, and his confession was completed at about 11:30 P. M. Immediately thereafter, Dr. Stephen Repta examined him and applied a new dressing to the wound. In the meanwhile, the confession was typed in final form, and Alfred signed it at about 1 A. M. in the morning of February 23, in the presence of representatives from various newspapers. He was then taken to a cell and the following morning accompanied police officers to the Tuscan Dairy, where he reenacted the crime. Afterward, Stokes was returned to police headquarters and was later arraigned before the local magistrate. At about 5 P. M. he was admitted to a hospital in Elizabeth, where he was operated upon and the bullet was removed the next day. On February 25 he was discharged from the hospital and returned to the Union County Jail, his condition upon discharge being listed as good.

According to Alfred, Detective Spies punched and slapped him when he was first taken into custody in Farmville. His

attempt to escape from custody in Farmville on the following day was the result of threats, taunts and goading by Spies and Reiss and the local police officers and fear of them. He further testified throughout the trip by automobile to New Jersey he was in constant pain from the bullet wound, which bled profusely, and was denied rest, food and medical attention. He claimed while in the automobile at National Airport Chief Lombardi told him he would receive no treatment for the wound until he had executed a confession. This, according to Alfred, was the basis upon which he submitted to the demands of the police.

The defendant called Dr. Ward, the radiologist at the Elizabeth hospital who had X-rayed him prior to the operation for the removal of the bullet, as a witness in his behalf. Dr. Ward testified the bullet had fractured the head of the iliac and stated that anyone suffering from a fractured bone would experience pain. Dr. Cox, who performed the operation, was also called by Alfred. However, he testified when he examined Alfred on his admittance to the hospital he had asked him whether he had had much pain, to which Alfred replied: "No. It is sore." On cross-examination, he said he had found Alfred to be in excellent general physical condition when he examined him.

Detective Spies and Reiss took the stand and denied having beaten or taunted or goaded Alfred in any way while he was in their custody in Farmville. They testified that during the return trip they, as well as Chief Lombardi, asked Alfred on several occasions whether he was comfortable and he replied he was, except his leg hurt him if he sat in one position. They said he never at any time complained to them of being in pain, and that on at least two occasions they stopped and procured food for him. Moreover, they said there was no indication that Alfred was bleeding at any time.

Chief Lombardi also testified and emphatically denied saying to Alfred that he must confess first in order to get medical attention. Lombardi was in the automobile during the portion of the trip from the airport to New Jersey and said on one or two occasions he asked Alfred whether he was

comfortable and Alfred replied he was. Lombardi's testimony was corroborated by Detective Martel, who was present in the automobile at the National Airport and who took down Alfred's statement in shorthand.

Dr. Repta testified he had examined Alfred after his arrival at the Union Township Police Station and found him to be in excellent physical condition and not complaining of any pain from the wound. He examined him again the following morning and on that occasion advised the police officers it would be all right to take Alfred out to the Tuscan Dairy to reenact the crime prior to removing him to a hospital for surgery. The hospital records disclose Alfred's general condition was good at the time of his admission.

Defendant's counsel concedes the general rule to be that a confession is not rendered involuntary merely because the defendant was suffering from severe physical injuries at the time he made it. See *State v. Dolan*, 86 *N. J. L.* 192 (*E. & A.* 1914); *State v. Grillo*, 11 *N. J.* 173, 180 (1952). It is the mental, and not the physical, condition and comprehension of the defendant when the confession is given which controls.

But it is said the confession was obtained here as a result of the " 'suction process,' and not the due process guaranteed under our Constitution." It is asserted it was not voluntary and hence inadmissible in evidence.

If all these things were true, prejudicial error would have been committed in admitting what would under these facts have been classified as a spurious document. However, counsel's contention rests upon no firmer ground than the testimony of the defendant—testimony which was contradicted by all the police officers plus every physician who examined him and by other corroborating evidence, including photographs produced by the State which belied Stokes' contention that his wound bled profusely during the trip to New Jersey.

It was for the trial court initially, and the jury ultimately, to determine whether the defendant's version of the circumstances which surrounded his confession had any verity, and

the record does not justify us in coming to an opposite conclusion.

If any doubt existed as to the fairness of the presentation of this phase of the case to the jury, it would have been dispelled by the court's charge to the jury in reference to these confessions in which it said, amongst other things:

"The fact that this court found these alleged written confessions to be admissible in evidence is no indication whatever by this court as to the guilt or innocence of the defendants who are said to have made them. * * * The credibility, the believability, and the weight to be given these alleged confessions, like all other evidence after it has been admitted, is for the jury alone. It is, therefore, within your province and for you to decide what weight if any is to be given to these confessions and as to this you are the sole judges.

In determining their value and weight, the jury is not precluded from considering the evidence touching the voluntary character of the confessions or the involuntary character of them. On the contrary, the jury is under a duty to consider all the evidence in the case, including that touching the voluntary or involuntary character of these alleged confessions and the occurrences and circumstances under which it is testified they had been given."

The State presents the novel thought that by virtue of the motion which was granted permitting the defendants the right to examine their confessions pursuant to R. R. 3:5–11 and their subsequent examination, the confessions automatically became admissible in evidence.

There is no unqualified right to inspect a confession, and the privilege to do so is only granted in the sound discretion of the trial judge upon application. *State v. Tune*, 13 *N. J.* 203 (1953). The adoption of the rule advocated by the State would relieve it of the burden of proving the confession was voluntary and truthful and would force upon the defendant in every criminal case the necessity for electing between the advantages to be gained from an inspection of his confession or an attack upon its admissibility. It would eradicate the advancement we thought we had made, as practically no one would seek an inspection of a confession if this interpretation were adopted. The dis-

covery and inspection procedure provided for by *R. R.* 3 :5–11 would be rendered meaningless. The suggestion has no merit and we reject it without reservation.

## Point VI.

### *Were the prosecutor's remarks improper?*

Counsel for the defendants in their opening statements to the jury admitted the defendants' participation in "this unfortunate drama" and thus narrowed the issue to be tried to the punishment to be imposed. They now inconsistently and for some unexplained reason object to the prosecutor's "preconceived views of guilt."

On two occasions during the trial, the prosecutor, referring to defendants' counsel's opening statements to the jury, said : "I am rather surprised by these objections. In their openings counsel said they were not denying anything in this case. They weren't going to put the State to all the burden of this." And again : "In their openings counsel made the statement that they weren't going to deny the presence of their clients at the crime."

The defendants now contend these statements had the effect of "branding the defense tactics as unfair and as unduly prolonging the trial and prejudicing, arousing and inflaming the jury against the defendants and their counsel."

The authorities cited have no application to the issues presented, and we are unable to perceive any impropriety in the utterances so made by the prosecutor under the undisputed circumstances.

## Point VII.

### *Were the photographs and other evidence properly admitted?*

Quoting from the opinion in *State v. Goebel,* 36 *Wash. 2d* 367, 218 *P. 2d* 300, 306 (*Sup. Ct.* 1950), determining

there that the minute peg of relevancy was entirely obscured by the quantity of dirty linen hung upon it, counsel urge the numerous cumulative and irrelevant photographs and other exhibits were improper because they had a tendency to inflame and arouse the emotions of the jury.

While the photos were common in portraying the same body, each revealed separate aspects which were not evident in the others and all were material as an aid to the jury in determining the extent of the wounds and their probable origin, which was in dispute as the defense insisted Bond's injuries about the head were not the result of an attack but were occasioned by a fall.

This question is mainly, if not entirely, within the discretion of the trial court, and its decision will not ordinarily be disturbed unless there is a marked abuse of discretion. *State v. Fiore,* 94 *N. J. L.* 477, 479 (*E. & A.* 1920); *State v. Fine,* 110 *N. J. L.* 67, 69 (*E. & A.* 1933).

The mere fact the photographs were cumulative does not of itself render them inadmissible. *State v. Myers,* 7 *N. J.* 465, 485–486 (1951). See *State v. Huff,* 14 *N. J.* 240, 251 (1954), where most of the above cases are cited, commented upon, and the rule is broadened to include colored photographs.

Next it is said all of the exhibits consisting of the clothing worn by the deceased at the time of his death were improper and that certain other photographs originally admitted in evidence over the defendants' objection but subsequently stricken from the record by the trial court were prejudicial. Some of the photographs objected to were scenes of the reenactment of the crime. Most of the clothing, apparently from the record, was introduced to assist the jury in determining the location of the entrance of the bullet into the body and the course it pursued thereafter.

We think all the exhibits here involved were proper for the orderly and intelligent presentation of the State's case. In any event, their admission was a matter of discretion in the trial court and we will not disturb the ruling unless

there is proof of its abuse to the prejudice of the defendant, which does not appear here.

## POINT VIII.

### *Were the defendants improperly required to initial the exhibits?*

The defendants, it is asserted, were "forced * * * to identify exhibits" to be used at the trial. This is tabulated as "compulsory self-incrimination," which without warning "encroaches upon individual liberty."

Factually, there is no justification for the assertion. The identification of the various exhibits was voluntary and they were marked for orderly presentation when the defendants were requested to do so.

There was no obligation to warn or caution the defendants, as decided in *State v. Pierce, supra,* where we held:

"As to the ground that the appellant was not advised of his right to remain silent or warned that any statement he made might be used against him, our courts have held uniformly that 'such cautionary instructions are not an essential step in the establishment of the fact that a confession is voluntary.' *State v. Hernia,* 68 *N. J. L.* 299 (*E. & A.* 1902) ; *State v. Cole, supra.* The general rule is, in the absence of a statute to the contrary, a voluntary confession is not rendered inadmissible because it was made without the accused having been cautioned or warned that it might be used against him or because he was not advised of his constitutional or legal rights such as his right to remain silent. * * *"

An exhaustive collection of cases generally following the principle there enunciated may be found in 25 *A. L. R. 2d* 1407, while in *State v. Alexander,* 7 *N. J.* 585 (1951), the right of the State to use the defendant's blood, taken against his will and consent, was objected to as an invasion of his constitutional right. The decision permitting it was upheld and the reasoning warranting such conclusion, supported by many cases there cited, seems to make it clear that the present contention lacks any real merit.

## Point IX.

*Was there error in the court's instruction that the defendants' failure to testify raised certain presumptions against them?*

■ The court charged:

"Under our law, a defendant cannot be compelled to testify, but he is competent to testify, and he has a right to testify, and his failure to be a witness in his own behalf is no presumption of guilt and does not erase the presumption of innocence, but if any inculpatory or incriminating facts are testified to which concern the acts of that particular defendant which he could by his oath deny, his failure to testify in his own behalf raises a strong presumption that he could not truthfully deny those inculpatory or incriminating facts."

No exception to the charge was noted, but under *R. R.* 1:5-1(*a*) it is contended we should consider it as plain error affecting the substantial rights of the defendants. *City of Newark v. Pulverman,* 12 *N. J.* 105 (1953). Counsel in their brief, however, concede the instruction is consistent with the decided cases in New Jersey, consisting of a long line of decisions following the rule as first laid down in the leading case of *Parker v. State,* 61 *N. J. L.* 308 (*Sup. Ct.* 1898), affirmed 62 *N. J. L.* 801 (*E. & A.* 1899), holding a trial court may properly comment upon the inference to be drawn from the defendant's failure to testify. See *State v. Costa,* 11 *N. J.* 239, 253 (1953).

It is insisted, nevertheless, that this well-entrenched rule patently violates our statutory privilege against self-incrimination and we are "urged to re-examine the entire issue on this appeal." Our attention is called to decisions outside our jurisdiction holding the prohibition against self-incrimination carries with it a corollary prohibition against adverse comment on the failure to testify. See the authorities collected in *Reeder, Comment on Failure of Accused to Testify,* 31 *Mich. L. Rev.* 40 (1932).

No cogent reason is advanced other than the mere thought of counsel that a change should be inaugurated, nor is there

a single instance cited over these many years throughout our embracement of the present rule showing basic unfairness created by our enforcement of it. The mere fact that it differs from the concept followed elsewhere carries with it no conviction it should be altered here.

Our administration of justice has not fallen into disrepute, nor can there be claimed a failure of it in the case *sub judice,* in which there is not even a suggestion before us that the verdict is against the weight of the evidence or that the innocent are adjudicated guilty without just cause and true foundation.

## POINT X.

### *Was there error in the trial court's reference to another case in the charge?*

■ In his charge to the jury, the trial judge carefully and in detail enumerated the verdicts which they might render and instructed them upon the mechanics of returning a verdict. In the course of these instructions, he told them:

"If you find that the defendants, or any of them, are guilty of murder in the first degree, you will say, 'Guilty of murder in the first degree.' Let me warn you that there was a very important case in which a conviction was reversed by the New Jersey Supreme Court because the jury came in and said: 'We find the defendant guilty of murder,' without say[ing], 'Guilty of murder in the first degree.' It was the same kind of case, one in which a robbery was involved. The Court reversed the conviction because the verdict was not complete."

At the conclusion of the charge, counsel for Harry Wise objected to the court's having made reference to another case in the charge, and on appeal he is joined by counsel for Albert Wise and Alfred Stokes in urging that the portion of the charge quoted above was not only erroneous but extremely prejudicial. It is said to be "highly improper for a trial court to refer to another case in its instruction to the jury * * *. It can only confuse and mislead them, often to the prejudice of one of the parties."

The defendants rely upon the decision of the Court of Errors and Appeals in *Talmage v. Davenport*, 31 *N. J. L.* 561 (1864). However, that case does not hold, as contended, that any reference to a reported decision in a charge to the jury is improper. The court there found the reference which was made—which included reading a portion of an opinion in a reported case—was calculated to mislead the jury and hence a reversal was required.

We fail to see how the portion of the charge quoted above could have in any way misled the jury in the instant case. To the contrary, the use by the trial judge of an illustration drawn from actual experience could only have clarified for the jury the necessity of rendering the verdict in the precise manner required by law, and certainly that is among the foremost functions of any instruction to a jury.

## POINT XI.

### *Was there error in the cross-examination of Harry Wise as to the accuracy of his confession?*

 Counsel for Harry Wise urges prejudicial error was committed when the prosecutor was allowed to ask Harry Wise on cross-examination whether there were any errors or mistakes in his confession. It is claimed Harry was put on the stand for the sole purpose and under a stipulation that he would testify only as to the "credibility" and "voluntariness" of his confession. The prosecutor's cross-examination, it is said, went beyond those limits and constituted an inquiry into the contents of the confession itself. At the time the questions were asked, Harry's two confessions had already been received in evidence.

The objection is plainly without merit. On his direct examination, Harry had testified he had absolutely no recollection of having given or signed the confession documents and that at the time he purportedly did so he was suffering from symptoms of "withdrawal from narcotics." In other words, it was contended the confession was not entitled to credibility as the author was insensible at the time.

Even though the inquiry was to be limited to the credibility of the confession, certainly the weight it was to be given depended, to some extent at least, on whether it was truthful. That was the purpose of the questions submitted. The answers speak for themselves. Their relationship to the inquiry undertaken is patent. They were within the scope of the restriction and were therefore proper and pertinent.

## POINT XII.

### *Was there error in the court's instructions to the jury?*

In support of his contention that his confession was involuntary, Harry Wise testified as to his prior use of narcotics and the circumstances under which he became an addict. In the course of this testimony, he said he had been taking narcotics for three years and had acquired the habit while on active duty in the United States Air Force in Korea.

The trial judge in the main body of his charge to the jury instructed them as follows:

"The statutory punishment for first degree murder is death, subject only to the condition that the jury in its absolute discretion chooses to recommend life imprisonment; a recommendation shall not be made, however, except after consideration of all the evidence and by incorporating the recommendation in the verdict of guilty."

Thereafter the court granted the State's requests Nos. 5 and 6 and instructed the jury as follows:

[No. 5] " 'During the course of this trial certain references have been made by counsel to the past life and background of the various defendants. Evidence with reference to past life and antecedent background are out of place in a trial for crime and should not be considered by you in determining your verdict. The crime itself and the circumstances under which it was committed form the criterion for a recommendation of life imprisonment or a refusal to recommend life imprisonment.'

'No. 6: By the same token, any suggestion or evidence that the jury should save a defendant from capital punishment because of

his repentance or remorse is not a legitimate issue and should not be considered by you in determining your verdict.' "

Counsel for Harry Wise objected to the instruction and here urges the charge given violated *N. J. S.* 2A:113–4, which provides:

"Every person convicted of murder in the first degree \* \* \* shall suffer death unless the jury shall by its verdict, and as a part thereof, upon and after the consideration of all the evidence, recommend life imprisonment, in which case this and no greater punishment shall be imposed."

It is said "Harry Wise was entitled as a matter of right to have the jury consider all the evidence before it in deciding whether or not to spare his life. The deprivation of that right constitutes reversible error."

Precisely how the evidence alluded to—and concededly this is the only evidence which was affected by the court's charge—would have affected the jury's deliberation upon the choice of punishment is not stated by counsel. Conceivably, had Harry been under the influence of narcotics at the time he committed the crime, that fact might have been considered by the jury as a mitigating circumstance. However, no suggestion was ever made during the trial that such was the case. We, of course, recognize the possibility that Harry's service record—although only the sketchiest details were given—might well have received sympathetic consideration from the jury. Indeed, that fact was carefully, indelibly and skillfully brought to the jury's attention in his counsel's summation, to a degree that probably no instruction on the part of the court could have effectively removed.

The statutory language requiring the jury's deliberations upon the punishment to be confined to "all the evidence" was enacted following the decision of the Court of Errors and Appeals in *State v. Martin,* 92 *N. J. L.* 436 (1919). It was there held that under the original act of 1916 (*P. L., c.* 270) the jury were at liberty but not required to consider the evidence in determining whether to make or to refuse a recommendation of life imprisonment. The Legislature

was in session when the decision in *State v. Martin* was handed down, and their immediate response was to adopt an amendment of the statute (*L*. 1919, *c*. 134), which in its present form is *N. J. S*. *2A*:113–4, quoted *supra*.

Two years later in *State v. James*, 96 *N. J. L*. 132 (1921), the Court of Errors and Appeals had occasion to consider the effect of the then recent amendment. There, the trial court had refused to admit evidence of the prisoner's family history, which was offered to show a taint of insanity in his family. On appeal, it was urged that although the defense of insanity had not been interposed, such evidence could have been taken into consideration by the jury on the question whether or not to recommend imprisonment for life. Chancellor Walker held the amendment of 1919 had been intended to and did overrule the decision in *State v. Martin*, *supra*, and that the statutory language, "all the evidence," meant "all of the evidence adduced between the State and the prisoner on the issue of guilt or innocence," (96 *N. J. L*., at *page* 151). He said (at *page* 150) :

"The Legislature could never have intended by this act to open the door to the trial of a collateral issue, such as insanity in the family of a prisoner who had not pleaded insanity in himself as a defense in bar, to enable a jury to decide to render a merciful verdict for a prisoner on trial for murder. * * *"

In *State v. Barth*, 114 *N. J. L*. 112 (*E. & A*. 1935), the defendant, on trial for first-degree murder, sought to introduce evidence concerning his past life and antecedent background to show that "in his family life he had been habituated to an atmosphere of violence, firearms, and crime, and being so habituated, should not be put to death for committing murder in the attempted perpetration of a robbery." (114 *N. J. L*., at *page* 116.) It was urged that since the jury had the prerogative under the statute of recommending life imprisonment, the propriety of such a recommendation became an issue in the case upon which relevant evidence could be introduced. The court, in rejecting this contention, said (*Ibid*.) :

"As a matter of precedent, in *State v. James*, 96 *N. J. L.* 132, cited and relied on by plaintiff in error, this court limited the phrase 'all the evidence' to mean 'all the evidence adduced between the state and the prisoner on the issue of guilt or innocence.' Evidence about 'past life and antecedent background' may be offered to the Court of Pardons, but is out of place in a trial for crime. The crime itself, and the circumstances under which it was committed, form the criterion for a recommendation *vel non* by the trial jury. The evidence was properly excluded."

The holding of the *Barth* case was adhered to and followed in *State v. Favorito*, 115 *N. J. L.* 197 (*E. & A.* 1935), and in *State v. Molnar*, 133 *N. J. L.* 327 (*E. & A.* 1945). In the latter case it was again pointed out (at *page* 335) that "the character of the sentence is not an issue for trial. The issue is guilt or innocence and, as always, only proof relevant to that issue is admissible."

 The highest tribunal of this State, despite an expressed minority view, has, from the time of the enactment of what is now *N. J. S.* 2*A*:113–4, consistently interpreted the phrase "all the evidence" to mean only evidence bearing upon the defendant's guilt or innocence. This interpretation of the statute follows not only the obvious legislative intent to avoid speculation on the part of the jury and to narrow the issues for their deliberation, but accords with common sense in making basic justice more certain in its administration.

Were the rule otherwise, it is quite evident that first-degree murder trials might well become hopelessly mired in autobiographical sketches and psycho-sociological debates, submerging the true issue of guilt or innocence.

We doubt if the end result would be productive of justice, as the jury would be further burdened by emotional equations in their deliberations, created by testimony totally dissociated from the crime itself, relating to unfortunate incidents and others encountered by most mortals in the normal span of life. This, we think, was the very evil the Legislature sought to obviate in enacting the amendment, which occasioned a reversal of a conviction for first-degree murder in *State v. Deegan*, 132 *N. J. L.* 261 (*E. & A.* 1944).

In the instant case, the evidence relating to the prisoner's background was admitted since it was relevant to the issue of the voluntariness of his confession. The jury may well have considered that evidence in deciding what weight should be given to the defendant's confession. However, merely because the evidence was properly received does not alter the rule. Such evidence clearly was irrelevant to the issue of guilt or innocence and under settled authority was properly excluded from the jury's deliberation upon a recommendation of life imprisonment.

Mindful of the fact that the defendants are under the sentence of death, we have examined the record with utmost care and are unable to find error in the proceedings below which either prejudiced the defendants or denied them a fair trial upon the charges laid in the indictment.

The judgments are accordingly affirmed.

HEHER, J. (dissenting in part). I would reverse the judgment of conviction entered against Harry Wise, for error in the instruction given the jury at the instance of the State, No. 5, that the "crime itself and the circumstances under which it was committed form the criterion for a recommendation of life imprisonment or a refusal to recommend life imprisonment," and that "Evidence with reference to past life and antecedent background are out of place in a trial for crime and should not be considered by you in determining your verdict."

This direction constituted a departure of substance from the principle of the statute, *N. J. S.* 2A:113–4, designed as it was to invest the jury in a capital case with full discretion, "upon and after the consideration of all the evidence," to "recommend" and thus to fix the punishment at life imprisonment.

I adhere to the rule of interpretation advanced in the dissent filed in *State v. Molnar*, 133 *N. J. L.* 327, 337 (*E. & A.* 1945): The statutory discretion is to be exercised upon a view of the evidence as a whole. The issue is committed to the judgment and consciences of the jury; and the inquiry

is whether, under all the circumstances disclosed by the evidence, it would serve the interests of justice, as between society and the accused, if capital punishment were not imposed.

The statute in unmistakable terms empowers, indeed directs, the jury to consider "all the evidence," not a given part of the evidence, in the resolution of the crucial issue of death or life imprisonment as the penalty for murder in the first degree; and there is no standard laid down for the guidance or control of the jury in the exercise of the function. It is enjoined only to consider "all the evidence" in the performance of the duty; and its action, after so doing, is not ruled by any criterion save its own collective discretion and judgment. This, by force of the broad terms of the statutory power..

"The authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court, or the jury, is of opinion that there are palliating or mitigating circumstances. But it extends to every case in which, upon a view of the whole evidence, the jury is of opinion that it would not be just or wise to impose capital punishment." *Winston v. United States,* 172 *U. S.* 303, 309, 19 *S. Ct.* 212, 215, 43 *L. Ed.* 456 (1899).

In elaborating the legislative text, great care must be taken to avoid alien refinements and distinctions infringing the substance of the function or tending to confuse the lay mind as to its essential quality; and the instruction here, I submit, does not satisfy this test. The policy is the exclusive province of the lawgiver; and it is to be enforced as written, giving to the legislative terms their normal sense and significance. Here, the judge charged the jury in the statutory language, "all the evidence," and then added the qualifying terms interposed by the State.

The ruling in *State v. Barth,* 114 *N. J. L.* 112 (*E. & A.* 1935), invoked by the State, concerned the exclusion of evidence obviously immaterial relating to "details of family life, some addressed to the defendant himself, some to his father, some to his sister and perhaps others, and bearing on such subjects as the reading of detective stories, listening to stories of the great war, playing of games involving the handling

of firearms, and the like," offered by the accused as relevant on the issue of punishment alone; and the holding there is to be assessed accordingly. The evidence now in question was adduced in substantial part by the State on cross-examination of the accused. He had served his country in the armed forces for three years, 11 months of that period on the Korean Front, where he formed the narcotic habit and had been an addict for more than four years when the killing here occurred. He was described by the physician who treated him after his arrest as a "sociopathic personality, a personality that has great difficulty in integrating himself into society and gets in conflict with society."

Otherwise, I concur in the opinion of Mr. Justice WACHENFELD. It is not contended the foregoing instruction prejudiced the codefendants. The defendants made no issue at the trial of their guilt of murder in the first degree; they sought only a mitigation of the punishment to life imprisonment.

I would reverse the judgment against Harry Wise, and direct a retrial of the issue as to him, and affirm the judgment of conviction against the codefendants, Albert Wise and Alfred Stokes.

JACOBS, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN— 6.

*For affirmance in part and reversal in part*—Justice HEHER—1.