JIM BOB CROW v. THE STATE.

*No. 279.     Decided April 28.*

1. **Expert Witness—Who Is.**—A witness may be an expert, though he may not consider himself one.

2. **Murder—Circumstantial Evidence—Charge.**—A charge on circumstantial evidence which in effect instructs the jury that each necessary fact must be proved beyond a reasonable doubt, that all facts must be conclusive in their nature, leading to the conclusion with moral certainty that defendant, and no other person, committed the murder, is correct, and in connection therewith it is not error to further instruct them, in effect, that they should acquit, if from the evidence or want of evidence they could account for the facts and circumstances in evidence upon any theory or hypothesis consistent with the innocence of the accused.

3. **Same—Improper Argument of Counsel—Duty of the Trial Court.**—On a trial for murder, where the district attorney in his argument said to the jury, "Now, gentlemen, if you acquit this defendant (pointing his finger at him) you set free the foul murderer of an innocent young girl, and the law can never lay its hands on him again; but if you should convict him, and in doing so should by mistake convict an innocent man, then he has his right of appeal, and the Court of Appeals will reverse the case and give defendant a new trial, and no injury will be done." *Held,* evidently improper, and having been objected to and called to the attention of the court, the court should have instructed the jury to disregard such argument, because it was improper, and should further have specially told them that it was their duty to determine themselves whether defendant was guilty, without any regard whatever as to what the Court of Appeals might do with the case.

4. **Practice on Appeal as to Affirming Judgments.**—On the trial of a criminal case, where the judge has correctly ruled the law as to matters pertaining to the trial, and has properly instructed the jury, the indictment being sufficient, this court will affirm the judgment if the guilt of defendant appears with reasonable certainty from the statement of facts. And again, if there be conflicting theories of guilt or innocence, or doubt as to guilt, this court will not reverse if the evidence supporting guilt be sufficiently cogent as to render the guilt of defendant reasonably certain.

5. **Same.**—In passing upon the sufficiency of evidence, the court on appeal does not pass upon the credibility of the witnesses nor reverse where the evidence is only conflicting.

APPEAL from the District Court of Milam.     Tried below before Hon. JOHN N. HENDERSON.

Appellant was indicted for the murder of one Mollie White. At his trial he was convicted of murder of the first degree, with the penalty assessed at imprisonment for life in the penitentiary.

The leading features of the case as developed by the evidence will be found substantially stated in the opinion. With regard to the question of expert evidence which is discussed by the court, the following are the facts as shown by the record:

It appears that two notes written by some one before the murder derogatory to the character of Mollie White, the deceased, and couched in the vilest language, had been found—one in the cornfield of her father, and the other near the home of defendant. It had been charged that these notes were written by Em Cast, to whom deceased was at the time engaged to be married, and they were the cause of the breaking off of that engagement between the parties. [The original notes were ordered to be sent up in the record, but they having been withdrawn for use on another trial, can not be reproduced.—REPORTER.]

The State proposed to prove by expert testimony and by comparison of handwriting that these notes had been written by defendant. For this purpose, in order to get a genuine acknowledged standard of comparison, a writing was introduced which was proved to have been written by defendant in an autograph album of a Miss Drew Scallon, who testified, that "about a year ago I asked defendant to write a verse in my album. He did so, and I stood by and saw him write it." [The writing was here shown to the witness and identified as the same which defendant had written in her album.]

The State then introduced the witness John B. McLane, who was held to be qualified as an expert, over defendant's objection, upon the following testimony: "That he had been engaged in different lines of mercantile business for about twenty years; was now and had been cashier of the First National Bank, in Cameron, for nearly a year. Had had considerable experience in handwriting, but did not consider himself an expert. Thought he could, by comparison, distinguish the handwriting of different persons. As cashier he was accustomed to pass on the signatures of his customers; that he considered himself competent to pass on handwriting of persons by comparisons; that if he had the genuine signature of a person he could tell whether another writing shown him was the handwriting of the same person. Kept a register of signatures of depositors whose signatures were unknown to him. Kept it for the purpose of comparing and passing on the genuineness of their signatures, but had never, in any instance that he recollected, made any such comparison. In testing the genuineness of checks, the signature was the only part of the writing considered. Had never studied the rules pertaining to the science of detecting handwriting by comparison and did not know what the rule was, but had a good deal of experience in judging of the handwriting of per-

sons by a comparison of the known writings of such persons with the writings to be passed on."

The charges of the court to the jury on the subjects of alibi and circumstantial evidence are as follows: "As to the defense of an alibi, you are instructed: If you believe from the evidence that Mollie White was killed by some one in the manner charged in the indictment, but you believe from the evidence that defendant was at another and different place than the place where said act was done, at the time of its commission, then and in such case acquit the defendant. Or if you have a reasonable doubt whether defendant was at the place of the commission of the offense at the time of its commission, doing said act, or was at the time at another and different place and not participating therein, give the defendant the benefit of such reasonable doubt and acquit him. In this case the State relies for a conviction on circumstantial evidence. In order to warrant a conviction on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by competent evidence beyond a reasonable doubt. All the facts must be consistent with each other and with the main fact sought to be proved; and the circumstances taken together must be of a conclusive nature and leading on the whole to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty that the defendant, and no other person, committed the offense charged. And you are instructed, if you are satisfied and convinced of the guilt of defendant in accordance with the above rule, you will return a verdict of guilty. If you are not so satisfied and convinced, you will return a verdict of not guilty. In this connection you are further instructed: In testing the question of the guilt or innocence of the defendant on circumstantial evidence, it will be the duty of the jury to exhaust every reasonable theory or hypothesis arising from the evidence, or from the absence of evidence, consistent with the innocence of defendant of the offense charged against him, and if you find any reasonable hypothesis consistent with his innocence, you will acquit him. And you can not convict defendant unless you believe that there is no reasonable theory or hypothesis consistent with innocence of the defendant; and you must further believe from the evidence, that the facts pointing to his guilt, if any there be, are consistent with each other, and. that they are of a conclusive nature, and produced in your minds a reasonable and moral certainty that defendant, and no other person, committed the offense charged. And unless you are so satisfied of the guilt of defendant, you will return a verdict of not guilty."

*E. B. Muse* and *Henderson & Streetman,* for appellant, filed a very able and elaborate brief in the case.

*R. L. Henry*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—The defendant in this case stands convicted for the murder of Miss Mollie White, the verdict being for murder of the first degree, with life sentence.

To show motive actuating this man to commit the crime, it was shown that he had waited upon her for a long time and had courted her unsuccessfully; that he had rivals in one Em Cast and one Ellison Lockhart. A witness for the State testified, that defendant told him that Miss Mollie had rejected him; that defendant on this occasion seemed very much affected—seemed to be crying; said he was going up there next day, get his letters and ring, and "she could go to hell." In a conversation afterwards he told this witness: "I will give you to understand that if I court a girl and can't get her nobody else shall have her, and especially Em Cast." This occurred more than a year before the killing.

A note was found in the field of deceased's father reflecting upon Miss Mollie. Another note was found at defendant's father's place of a similar character, and delivered to the Whites. The authorship of this note was attributed to Cast, and was the cause of the breaking of an engagement to marry between him and Miss Mollie. On the trial it was proved to be in the handwriting of defendant. Miss Mollie was killed on the 10th of July, it being Sunday night, at about 12 o'clock. She had attended church that night with Ellison. She and the rest of the family retired between 11 and 12 o'clock, and before *1 o'clock* she was dead. Her throat was cut by a sharp instrument. Near the bed upon which she slept was an open window through which the assassin came and escaped. The father of the deceased testified, that outside of the window there were tracks leading off through the cotton patch. There was one track deeper than the rest, where it seemed that the party had jumped out of the window.

W. H. Strickland, a constable, testified: "A short distance from the window there was a track deeper than the other tracks. * * * The tracks then led off in a northwesterly direction about ten or twelve steps to the cotton patch, and then diagonally across the cotton patch. The party appeared to be running across the cotton patch. I measured the best tracks that I could find for measurement in the cotton patch. It was difficult to get a good track to measure on account of the soft condition of the ground, but I found some tracks that were tolerably plain, and where I could get a plain track the measurements were the same; first measured with a stick, then with a rule. I only measured the tracks in the cotton patch. [Defendant pointed out to witness the shoes he had worn on the day of the homicide.] I compared the measurement of the shoes with the measurements of the tracks. I had measured the length of the foot and the width, and the

length and width of the heel. The track and the shoes measured the same except the heel. There was a difference of a quarter of an inch either in the length or width of the heel, and I can't say for certain which, but think it was in the length."

Sheriff Bickett testified, that he followed the tracks out across the cotton patch. "I measured the length of the tracks. Did not measure the heel nor the width of the tracks across the toe. I measured the tracks with a switch. On next day measured the shoes which defendant said he had worn on Sunday. I thought that the measurements fitted the shoes pretty well. The shoes were about a seven."

Deputy Sheriff Gambill, at the instance of the sheriff, got the shoes of defendant to compare with the tracks in the cotton patch. He made the comparison on Tuesday. He testifies: "I thought they were exactly alike. The shoes were run in, and the left shoe was run in more than the right. I noticed the corresponding peculiarity about the track. I placed the shoes in the tracks and I thought they fitted exactly. I made tracks by the side of the original tracks with the shoe and they appeared to be the same. One tap had been removed from the heel of the left shoe, and the tacks projected about one-sixteenth of an inch. I noticed the imprint of the tacks in the tracks. The tacks that projected were on the left of the heel, and nearer the back than the front. On the left shoe the tacks were exactly the same way. I did not count the tacks. I noticed near the house, where the party had stepped on a rock with his left foot and slid off, and the tacks had left scratches on the rock. * * * There are some worn places about the size of a half-dollar on the inside of the sole of each shoe, where the soles were worn out. I did not see anything corresponding to these places in the tracks, but they were filled up with mud and the bottom of the shoes appeared smooth. * * * The tracks were very plain and clear. I found many, and compared and examined many tracks, and every time the left was running in, had a missing tap, and the extending tacks corresponded exactly with the left shoe of defendant. * * * These are the shoes that made the tracks. Defendant wears about a number seven."

Strickland, the constable, also testified, that he followed the trail beyond the cotton patch, through a pasture of mesquite grass, by the dew being brushed away from the grass. No foot tracks here. Three or four hundred yards beyond this pasture there was no trail. At this distance there was a fresh track of an unshod horse. This led to a crossing on the Gabriel. The horse track led up to about three feet of the water. "I saw a man's track. The toe of the track was just in the edge of the water and was tolerably plain. It was the track of the left foot. To the right of it, and about a foot from it, there was an indentation about the size of the palm of my hand, and about an eighth or a quarter of an inch deep, that might have been made by the knee

of a man. * * * On Tuesday I saw an unshod horse at defendant's house. I moved him off and looked at his track, and it was similar to the one I had traced that morning. I saw the pants that defendant said he had worn on the day before. There was some mud on the right knee of the pants. I think I called Mr. Bickett's attention to the mud on the knee."

Neither the sheriff nor his deputy remembers having noticed any mud on the knee of the pants.

On the other hand, appellant proved facts by a number of witnesses which, if they were in fact true, negative very powerfully his guilt. If true, he was not at the place of the homicide when it occurred, but was at his home. This evidence of alibi was followed by the testimony of W. H. Strickland, namely: "I compared the measurements of the shoes with the measurements of the tracks which I had made. I had measured the length of the foot and the width, and the length and width of the heel. The track and the shoes measured exactly the same except in the heel. There was a difference of a quarter of an inch either in the length or the width of the heel, and I can't say for certain which, but think it was the length." Now, we are not informed by this witness whether the heel or the shoe was longer than the track. If the heel was the longer, evidently the tracks in the cotton patch near the place of the homicide were not made by the shoes of the defendant, and all of the supposed inculpatory inferences drawn from the tracks crumble to dust. If the track of the heel was longer than the heel, the length of the whole track and the shoe being the same, it is certain that the shoe of defendant did not make the tracks. If the difference was in the width of the heel and the track, this may have been accidental. But we gather from the testimony of this witness that all of the tracks of the heel presented this difference. If this was the case, then the shoes of defendant did not make the tracks found in the cotton patch near the place of the homicide.

We have stated the salient facts for both sides as preliminary to the discussion of certain remarks made to the jury by counsel for the State. Before, however, noticing these remarks, we will dispose of certain objections made to the admission of evidence and to the charge of the court.

A witness may be an expert, though he may not consider himself one.

This being a case depending for conviction wholly upon circumstantial evidence, the court instructed the jury, that each necessary fact must be proved beyond a reasonable doubt; that all the facts must be consistent with the guilt of defendant; that they must be conclusive in their nature, leading to the conclusion, with moral certainty, that defendant, and no other person, committed the murder. This was correct. After presenting the subject in this light the learned

judge submits it in another form, by instructing the jury in effect that if they, from the evidence or from the want of evidence, could account for the acts and declarations (the case) of the accused upon any thing or hypothesis consistent with his innocence, then to acquit. In this there was no error. We have not copied the charge of the court, but merely stated its effect, and we think it without fault.

The instructions on alibi are in conformity with the opinion in the case of Gallaher v. The State, 28 Texas Criminal Appeals, 247.

In his closing argument the district attorney said to the jury: "Now, gentlemen, if you acquit this defendant (pointing his finger at him) you set free the foul murderer of an innocent young girl, and the law can never lay its hands on him again; but if you should convict him, and in doing so should by mistake convict an innocent man, then he has his right of appeal, and the Court of Appeals will reverse the case and give the defendant a new trial, and no injury will be done." Counsel for defendant arose and appealed to the court to stop such remarks. The court told the district attorney to hold a minute until defendant's counsel could state his objections. Defendant's counsel stated his objections. The court said he did not know whether the language was improper or not, but told the district attorney to proceed and to keep within the record, which he did, making no reference to this matter again.

Such an argument, if it could be called argument, should not have been tolerated for a moment. It was most powerfully calculated to induce the jury to convict the appellant. An innocent girl had been assassinated on her bed. Her throat was cut by some one at midnight, evidently while she was asleep. It was natural and proper for the jury to be disposed to convict the perpetrator of this most bloody and unnatural murder, and under the circumstances of this case a jury would not be inclined to acquit, though there might be doubt of guilt, by a reasonable doubt. Now there is a way of escape suggested. An atonement for this foul murder should be had; some person should be punished. There is evidence against the defendant; he may be guilty. If we acquit, there will be no atonement, no person punished; if we convict wrongfully, he will be in no danger; our verdict will be set aside by the Court of Appeals and no harm will be done. We will adopt the suggestion made by the district attorney, though there may be doubt of defendant's guilt, and let the Court of Appeals settle the question whether the defendant is guilty and should be punished.

While it is true that if the defendant be guilty and should be acquitted by the verdict of the jury "the law could never lay its hands on him again," the statement that if defendant was wrongfully convicted this court would reverse the judgment may or may not be true. When the trial judge has ruled the law correctly pertaining to the trial and has instructed the jury properly, the indictment being suffi-

cient, this court will turn to the statement of facts to ascertain if the guilt of the appellant appears with reasonable certainty. If it does, the judgment will be affirmed. And in passing upon the sufficiency of the evidence which supports the verdict, we do not pass upon the credibility of the witnesses. Again, if there be conflicting theories, one presenting guilt and the other innocence, or creating doubt of guilt, rejecting the others, this court will not reverse if the evidence supporting be sufficiently cogent as to render the guilt of the defendant reasonably certain. In such a state of case all theories, except that presenting guilt, being in conflict therewith, will be rejected by this court.

Let us apply this rule to this case. If the jury believed the testimony of Strickland and the evidence of alibi, they should have acquitted appellant. But they evidently rejected this evidence, adopting the theory which tended to establish defendant's guilt. Being the judges of the credibility of the witnesses and the weight which should be given to the testimony, their decision as to which theory was in fact true is conclusive upon this court. And this is so, though each member of this court, as the evidence appears to us from the statement of facts, might be inclined to adopt the theory favorable to the defendant. These observations demonstrate the fallacy of the proposition or statement, that if appellant be wrongfully convicted he will be certain to have the conviction reversed, and therefore no harm will be done. The writer has no doubt but that there are now in the penitentiary of the different States hundreds of innocent persons, the judgments of convictions having been affirmed.

What, therefore, should the court have done when counsel called attention to the remarks of the district attorney? State to the jury that he was in doubt as to whether the remarks were proper or not? There could and should have been no doubt as to this matter. They were evidently improper, and the jury should have been informed of this fact and instructed not to regard the remarks, and especially should they have been told that it was their duty to determine themselves whether appellant was guilty, and to do this without any regard whatever as to what the Court of Appeals might do with the case.

This statement of the district attorney, and expression of doubt by the learned judge as to its propriety, left to the jury to use it as they pleased, and they may have adopted the suggestion and convicted appellant, believing that if he was not satisfied he could appeal, and if they were wrong the mistake could be cured and no injury done the appellant.

Under the circumstances of this case we are of the opinion that the remarks of the district attorney, in connection with the statement of the judge in relation thereto, were calculated to injure the rights of the appellant, and, being so calculated, did have this effect, and for

which the judgment is reversed and cause remanded to be tried by a jury without reference to what this court might think of the facts of the case.

*Reversed and remanded.*

Judges all present and concurring.