THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JAMES ALFRED MOUNT, DEFENDANT-APPELLANT.

Argued April 20, 21, 1959—Decided June 17, 1959.

196

198

*Mr. John B. Stone, Jr.* argued the cause for the appellant (*Mr. Thomas C. Mahon,* attorney).

*Mr. Cuddie E. Davidson, Jr.* argued the cause for the respondent (*Mr. H. Douglas Stine,* Union County Prosecutor, attorney).

The opinion of the court was delivered by

JACOBS, J.   The defendant was found guilty of murder in the first degree without any recommendation of life imprisonment.   He was sentenced to death and appealed to this court as of right under *Article* VI, *Section* V, *paragraph* 1 of the *Constitution*.

The body of Ruth Lowe Petrosky was discovered during the evening of August 7, 1957 in the cellar of the apartment building where she had lived with her husband and children.   She had been brutally stabbed to death and her injuries, which had apparently been inflicted by means of a thin blade, included 13 or 14 stab wounds in various parts of her body.   She was fully clothed and there was no evidence suggesting that there had been any attempt to assault her sexually.   Members of the Union County Prosecutor's office and the Plainfield police department questioned tenants in the building, and early during the morning of August 8 they were admitted to the Mount apartment by the defendant's father George Mount.   The defendant, who was then sleeping in the apartment, was awakened and taken to the Plainfield police headquarters where he was questioned and confessed that he had killed Mrs. Petrosky.   He identified an 11½-inch homemade knife which had been found in the Mount apartment as the lethal weapon and he told the police officers where they would find, as they did, the blood-stained trousers he had worn at the time of the stabbing. He signed a written statement during the morning of August 8 and a clarifying supplemental statement during the afternoon of the same day.   In these statements he gave substantially the following story:

He is 18 years of age and his formal education consisted of eight years of grammar school. He served in the United States Navy from March 5, 1956 to July 25, 1957 and holds a general discharge. His parents are divorced, he has been living with his father, and he has not seen his mother for about three years. He is employed as a stock boy at the Mayfair supermarket in Plainfield. Mrs. Petrosky's apartment was across the hall from the Mount apartment and he had a nodding acquaintance with her. On August 6 he passed Mrs. Petrosky and as he ran up the stairs she said something which he "did not quite catch." As he came down the stairs he again passed her and said, "I'll see you later honey" to which she replied "Yes, O. K." When he came home from work, he knocked on her door and said, "How about now." She then said she was only "kidding" and he returned to his own apartment. He had inferred that she wanted to have intimate relations with him and when he thought about the matter he "got mad" but then "forgot about it." On the following day while at work he again thought about the matter, "got mad again" but then "forgot about it." He went home about 6 P. M., started watching television, "started thinking about it again, and I guess I got pretty damn sore." When he heard Mrs. Petrosky leave her apartment, he picked up a bag of trash, and a knife which was lying on the kitchen table, followed her to the cellar where she had gone to put trash in a garbage can, stabbed her as she was about to come up the cellar stairs and "just went nuts and kept stabbing her." He "did not try to have any sexual relations" nor did he rip "any of her clothes." He returned to the Mount apartment, washed the knife, changed his trousers, walked to the "railroad bank" where he threw his trousers away, went to the movies, and later went to sleep until awakened by the police officers.

In due course the defendant was indicted for murder, counsel was assigned to him, and the matter came on for trial. In his opening, counsel for the defense did

not deny that the defendant had caused the death of Mrs. Petrosky in the manner set forth in the statements but stressed the defendant's youth and unfortunate history and the alleged lack of a planned killing as grounds for avoidance of imposition of the extreme penalty of death. Counsel stated that he would offer background evidence, including testimony indicating that when the defendant was five years old his father entered the United States Army; that his mother then "took up with a paramour" and lived in open adultery; that when the defendant was 16 years old his mother sent him to live with his father, who "had taken up himself with another woman," and that the defendant's father was "a man of loose morals, who flaunted his immorality in the presence of this boy in the apartment in Plainfield." During the course of the trial defense counsel called the defendant's mother as a witness and asked whether her children, including the defendant, had been placed in an orphanage. The State's objection to this question was sustained by the trial judge, who ruled that "evidence with reference to past life and antecedent background is irrelevant to the issue of guilt or innocence, and under settled authority is properly excluded from the jury's deliberation in determining whether or not to recommend life imprisonment." See *State v. Wise*, 19 *N. J.* 59 (1955); *State v. Barth*, 114 *N. J. L.* 112 (*E. & A.* 1935). Additional questions addressed to the defendant's father, mother and grandmother, and seeking to elicit information as to the defendant's background, were consistently excluded by the trial court.

The defense called Dr. Garber, a duly qualified psychiatrist, to testify as to whether the defendant was capable of premeditation at the time he stabbed Mrs. Petrosky. See *State v. Close*, 106 *N. J. L.* 321, 324 (*E. & A.* 1930); but *cf. Fisher v. United States*, 328 *U. S.* 463, 66 *S. Ct.* 1318, 90 *L. Ed.* 1382, 166 *A. L. R.* 1176 (1946). In the course of his examination of the defendant, Dr. Garber had obtained a history which he stated was "customary as part

of the psychiatric evaluation." He was not permitted to state what the history was nor was he permitted to testify on the basis thereof. However, the trial court did permit him to give the following answer in response to a hypothetical question grounded exclusively on the evidence admitted during the trial:

"I believe that there are a number of very significant facts that have come out of this hypothetical question, which leads me to the conclusion that this defendant was not a well person, as reviewed by the information in this skeletal background, which leads me to the conclusion that as a result of the behavior described that I don't believe he was capable of premeditating this crime. The recitation of what he did in enacting it, what he did following it, is very significant, and for these reasons I do not believe that he was reacting in what we in psychiatric terms would say is the behavior of a normal person."

During cross-examination Dr. Garber noted that he found it very difficult to exclude the information he had obtained from his examination of the defendant from the matters set forth in the hypothetical question, and that he would be in a position to answer more readily if he had the opportunity of utilizing all of the information available to him; he testified that "I don't think this man was medically insane to the point that he was committable to an institution, but I do say he underwent a disturbance of his thought processes that he was unable to premeditate"; and he expressed the feeling "that all the acts that are contained in this continuing episode" are those of a person "very emotionally ill" though "not legally insane." Dr. Flicker, a duly qualified psychiatrist called by the State, testified that according to the facts in the hypothetical question the man had "the ability to premeditate and to plan" and that he saw nothing in the hypothetical question that would indicate lack of ability to premeditate, whereas much of it indicated "that he would have the ability to premeditate." He testified that he had never examined the defendant and had considered only the matters set forth in the hypothetical question.

At the outset of the trial it was recognized by all that it was vital that there be selected an impartial jury having no conscientious scruples against capital punishment and no prejudices against the substitution of life imprisonment therefor. See *Funk v. United States*, 16 *App. D. C.* 478, 485 (1900); *certiorari* denied, 179 *U. S.* 683, 21 *S. Ct.* 916, 45 *L. Ed.* 385 (1900); *Snell v. United States*, 16 *App. D. C.* 501, 506 (1900); *United States v. Puff*, 211 *F. 2d* 171, 183, 48 *A. L. R. 2d* 540 (2 *Cir.* 1954), *certiorari* denied, 347 *U. S.* 963, 74 *S. Ct.* 713, 98 *L. Ed.* 1106 (1954). Accordingly, there was extensive *voir dire* examination by the prosecuting attorney, who concentrated on excluding jurors who were opposed to the infliction of capital punishment for the crime of murder, and the defense attorney, who concentrated on excluding jurors who were opposed to the substitution of life imprisonment as the appropriate punishment. When prospective juror Bloom was called, 58 veniremen had been examined, 18 had been excused because of their opposition to capital punishment, and 8 had been chosen to serve as jurors. The prosecuting attorney asked Mr. Bloom, as he had consistently asked all of the previous veniremen, whether "in a proper case where the facts warrant and under the charge of the law by the court would you vote for a verdict of murder in the first degree, knowing that as a result of that verdict the defendant would be put to death?" *Cf. State v. Bunk*, 4 *N. J.* 461, 468 (1950), *cert.* denied, 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615 (1950). At that point the trial judge, in the presence of all of the jurors who had been selected and the veniremen who remained to be called, interrupted to state that "we have appeal courts and everything else, so a lot of things could happen." He suggested that the question be altered to inquire whether the venireman could vote for murder in the first degree knowing that the defendant would receive the death sentence, and remarked that "saying knowing that the defendant would be put to death, other things could happen which could change the situation." When the prosecuting attorney then took

the position that his original question was entirely proper, the trial court repeated that the venireman "has no way of knowing the defendant is going to be put to death" and that while the death sentence is automatically imposed upon a finding of guilty of murder in the first degree, "whether it will ever be carried out or not we do not know. The appeal court may decide it." The prosecuting attorney then stated that "the jury must face that as the probability," but the trial court responded, "the jury cannot face it, because it may not happen. Only the other day a conviction was reversed by the Supreme Court."

When prospective juror Covert stated that she was opposed to capital punishment and thought "a person who does something like that is really sick," the trial court inquired whether she would feel the same way if "you were, or some members of your family, had been affected by it." When prospective juror Cullinane stated his opposition to capital punishment the trial court inquired whether he would feel the same way if a member of his own family "was the victim." When prospective juror Ripak stated that she could not render a verdict of guilty of murder in the first degree knowing that it would mean the death penalty, the trial court inquired whether she would feel the same way about capital punishment if a close member of her family had been the victim of an alleged fatal attack and someone was on trial for the offense. Similarly, when prospective juror Clark stated her opposition to capital punishment, the trial court inquired whether she would feel the same way if a close member of her family was the victim of a fatal attack. When she stated that she could not answer the question the trial court then inquired, "Do I understand you to mean that you are against capital punishment when someone else is involved but you might not be if a member of your own family was involved?" When prospective juror Coffey expressed her opposition to capital punishment, the trial court inquired whether she would feel the same way if a member of her own family was involved in a fatal offense as a victim.

When Mrs. Coffey replied in the affirmative, saying she had three sons, the trial court inquired, "would you feel the same way if one of your sons was the victim?" When prospective juror Casano was being examined she stated that as a Catholic she did not like capital punishment, and at that point the trial court stated that the Catholic religion was not opposed to the death penalty. When prospective juror Cunningham stated that she did not believe in capital punishment, the court inquired whether her conviction was personal or religious and she answered, "Well, religious. I don't believe that a life can be taken." In response to the trial court's further inquiry she stated that she was a Catholic, and the court then repeated its earlier statement that "the Catholic Church is not opposed to capital punishment." All of the quoted remarks of the trial court were made in the presence of such jurors as had been chosen and the prospective jurors who were awaiting their *voir dire* examination.

The defendant's primary contention is that the trial court's comments during the *voir dire* examination unfairly prejudiced his opportunity for a jury recommendation of life imprisonment which would have automatically avoided his death sentence. See *N. J. S.* 2A:113–4. He cites the court's repeated references to the fact that even though the jury returned a verdict of guilty of murder in the first degree without any recommendation of life imprisonment the defendant might nevertheless avoid the death penalty by action of the Supreme Court on appeal, as tending unjustly to reduce the jury's sense of responsibility in its determination of punishment. See *State v. White,* 27 *N. J.* 158, 172 (1958); *People v. Johnson,* 284 *N. Y.* 182, 30 *N. E.* 2d 465, 132 *A. L. R.* 675 (*Ct. App.* 1940). He points out that the trial court's hypothetical questions which inquired whether the prospective jurors would oppose capital punishment if a close relative were the victim wrongly tended to inflame and steel the jurors against returning a recommendation of life imprisonment. See *State v. Smith,* 216 *La.* 1041, 45 *So.* 2d 617 (*Sup. Ct.* 1950); *State v. Canipe,* 240

N. C. 60, 81 *S. E. 2d* 173 (*Sup. Ct.* 1954); *cf. Manuel v. United States,* 254 *F.* 272, 274 (8 *Cir.* 1918); *Leverett v. State,* 112 *Miss.* 394, 73 *So.* 273 (*Sup. Ct.* 1916). And he voices his objection to the court's inquiries as to religion (*cf. State v. Weiss,* 130 *N. J. L.* 149, 153 (*Sup. Ct.* 1943), affirmed 131 *N. J. L.* 228 (*E. & A.* 1944)), and its extra-record assertion that the Catholic Church does not object to capital punishment, as tending to suggest preferment of the death penalty over life imprisonment as the punishment for murder. In all, he strongly urges that the cumulative effect of the trial court's remarks was to deprive him of the fair trial and determination to which he was justly entitled on the crucial issue of life or death. See *State v. Orecchio,* 16 *N. J.* 125, 129 (1954); *cf.* Frankfurter, J. dissenting in *Fisher v. United States, supra,* 328 *U. S.* at *page* 477, 66 *S. Ct.* at *page* 1325, 90 *L. Ed.,* at *page* 1391:

"It is not enough .that a trial goes through the forms of law. Especially where life is at stake it is requisite that the trial judge should so guide the jury that the jurors may be equipped to determine whether death should be the penalty for conduct. Of course society must protect itself. But surely it is not self-protection for society to take life without the most careful observance of its own safeguards against the misuse of capital punishment."

In *Winston v. United States,* 172 *U. S.* 303, 19 *S. Ct.* 212, 43 *L. Ed.* 456 (1899), the court dealt with the congressional enactment which authorizes a federal jury to qualify its verdict of guilty of the crime of murder by adding thereto "without capital punishment." See 18 *U. S. C. A.* § 1111(*b*) (1950). The jury had returned its unqualified verdict of guilty after the trial court had charged that its verdict should be qualified only if mitigating or palliating circumstances were proved. In reversing, the Supreme Court had this to say:

"The right to qualify a verdict of guilty, by adding the words 'without capital punishment,' is thus conferred upon the jury in all cases of murder. The act does not itself prescribe, nor authorize the court to prescribe, any rule defining or circumscribing the exer-

cise of this right; but commits the whole matter of its exercise to the judgment and the consciences of the jury. The authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court, or the jury, is of opinion that there are palliating or mitigating circumstances. But it extends to every case in which, upon a view of the whole evidence, the jury is of opinion that it would not be just or wise to impose capital punishment. How far considerations of age, sex, ignorance, illness, or intoxication, of human passion or weakness, of sympathy or clemency, or the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever, should be allowed weight in deciding the question whether the accused should or should not be capitally punished, is committed by the act of Congress to the sound discretion of the jury, and of the jury alone." (172 *U. S.*, at *pages* 312–313, 19 *S. Ct.* at *page* 215, 43 *L. Ed.*, at *pages* 459–460)

In *Funk v. United States, supra,* and *Snell v. United States, supra,* the court was highly critical of *voir dire* examinations which go beyond interrogations fairly designed to ascertain whether the prospective jurors have any scruples against capital punishment or any bias against imprisonment for life as the punishment for murder. *Cf. Morgan, "Examination of Jurors Prior to Challenge,"* 31 *Yale L. J.* 514, 518 (1922). And in *Manuel v. United States, supra* [254 *F. 2d* 274], the court reversed a murder conviction where the trial judge had persisted in interrogating prospective jurors (who voiced their opposition to capital punishment) as to their willingness as citizens to enforce the law as enacted by Congress; Circuit Judge Stone pointed out that the examination "upon the point of any prejudice against capital punishment should have been confined to an ascertainment of the juror's views and the strength thereof, with the sole object of determining whether he would approach the issue of capital punishment in the proper frame of mind." In *United States v. Puff, supra* [211 *F. 2d* 184], the court sustained the trial judge's limited *voir dire* examination as properly designed to ascertain the impartiality of the prospective jurors; it rejected the defendant's contention that jurors with scruples against capital punishment should

not have been excused for cause, pointing out that if, as indicated in *Stroud v. United States,* 251 *U. S.* 15, 40 *S. Ct.* 50, 64 *L. Ed.* 103 (1919), rehearing denied, 251 *U. S.* 380, 40 *S. Ct.* 176, 64 *L. Ed.* 317 (1920), jurors with bias in favor of capital punishment are disqualified, "certainly·jurors with bias against the death penalty should similarly be disqualified."

In *State v. Juliano,* 103 *N. J. L.* 663 (*E. & A.* 1927), the Court of Errors and Appeals dealt, under the comparable New Jersey statute, with a contention similar to that advanced by the defendant in *United States v. Puff, supra.* The history of the New Jersey statute was recently discussed by this court in *State v. White, supra.* There it was pointed out that in 1908 the Committee to Inquire into the Subject of Capital Punishment submitted its proposal, which represented a compromise between those seeking abolition of capital punishment and those seeking its retention; that pursuant to the Committee's report the Legislature enacted *L.* 1916, *c.* 270 which authorized the jury to accompany its finding of guilty of murder in the first degree with a binding recommendation of life imprisonment; that thereafter in *State v. Martin,* 92 *N. J. L.* 436 (*E. & A.* 1919), a sharply divided court held that the recommendation was not a part of the verdict and did not require the support of evidence but could rest upon any considerations in the jury's discretion; and that immediately following the decision in *State v. Martin, supra,* the Legislature enacted *L.* 1919, *c.* 134 (now *N. J. S.* 2A:113-4) to provide that the recommendation shall be part of the verdict and that it shall be "upon and after consideration of all the evidence." In the *Juliano* case the court, after quoting from *L.* 1919, *c.* 134, held that the State has the privilege of contending that upon the evidence the verdict should be without recommendation and the right to have jurors receive this contention with open mind and without conscientious scruples against capital punishment. See *State v. Favorito,* 115 *N. J. L.* 197, 199 (*E. & A.* 1935); *State v. Bunk, supra,*

4 *N. J.,* at *page* 468. And while the court had no occasion to deal with the defendant's privilege to contend that upon the evidence the verdict should be with recommendation and his right to have jurors receive this contention with open mind and without any prejudice against life imprisonment as the punishment for murder, it is clear to us the defendant has such privilege and right. See *Funk v. United States, supra; Snell v. United States, supra; United States v. Puff, supra; State v. Jackson,* 227 *La.* 642, 80 *So. 2d* 105 (*Sup. Ct.* 1955). *Cf. Knowllon, "Problems of Jury Discretion in Capital Cases,"* 101 *U. Pa. L. Rev.* 1099, 1107 (1953).

In *People v. Johnson, supra,* the defendant was convicted of murder in the first degree and duly appealed. He contended that the prosecuting attorney's references, during the *voir dire* examination, to the defendant's right of appeal in the event of conviction and to the Governor's commutation power in the event the conviction was sustained, had prejudiced his opportunity for a fair and impartial determination at the trial level. In agreeing with his contention and in reversing the conviction the New York Court of Appeals pointed out that the references tended to suggest that a verdict of guilty could not be seriously harmful to the defendant because of his opportunities for review and tended to weaken the jury's sense of obligation in the performance of its duties. In *Hammond v. State,* 156 *Ga.* 880, 120 *S. E.* 539, 541 (*Sup. Ct.* 1923), the court remarked that the prosecuting attorney's reference to the defendant's right of appeal in the event of conviction "tended to lessen the sense of the peculiar and sole responsibility resting on the jury." In *State v. Biggerstaff,* 17 *Mont.* 510, 43 *P.* 709, 711 (*Sup. Ct.* 1896), the court noted that such a reference tends "to induce the jury to place a lighter estimate on their own solemn duties than they otherwise would, perhaps, have done." And in *Crow v. State,* 33 *Tex. Cr. R.* 264, 26 *S. W.* 209 (*Cr. App.* 1894), the court reversed a conviction of murder because the prosecuting attorney had improperly stated to the members of the jury that if they erroneously

convicted the defendant his rights would be fully protected on appeal. See *Kelley v. State,* 210 *Ind.* 380, 3 *N. E. 2d* 65, 74 *(Sup. Ct.* 1936); *Gray v. State,* 191 *Tenn.* 526, 235 *S. W. 2d* 20, 24 *(Sup. Ct.* 1950).

In *State v. White, supra,* this court recently reversed a conviction of murder in the first degree and the ensuing death sentence because the trial court had erroneously dealt in its supplemental charge with the defendant's opportunity for parole in the event there was a recommendation of life imprisonment. In the course of his opinion the Chief Justice noted that the Legislature had committed to the jury the exclusive responsibility of determining whether the punishment should be life or death; that the jury performs this task completely when it decides the matter upon the evidence before it; that what happens thereafter is not the concern of the jury; and that the jury must exclude from its consideration parole policies which the Legislature has entrusted to an independent agency of government. See 27 *N. J.,* at *page* 177. The principles expressed in *White* are fully applicable here. Thus the jury in the instant matter had the sole responsibility of passing on life or death, and it was its solemn obligation to deal with that issue without at all considering the possibility of an appeal to this court; indeed, the appeal to this court is necessarily confined to matters other than the wisdom or justice of the withholding of the recommendation of life imprisonment which the statute has effectively placed in the absolute discretion of the jury upon its consideration of all the evidence.

In *State v. Smith, supra* [216 *La.* 1041, 45 *So. 2d* 618], the defendant was convicted of murder and sentenced to death. On his appeal, he urged that he was prejudiced by the prosecuting attorney's *voir dire* examination. The prosecuting attorney had asked a prospective juror the following question: "You would not inflict capital punishment, even if he had raped your own daughter," and had asked another prospective juror whether he had conscientious scruples against capital punishment "even in the

case of rape." The Louisiana Supreme Court held that the questions were improper, that the defendant had been prejudiced by them, and that the conviction and death sentence must be set aside. In *State v. Canipe, supra* [240 *N. C.* 60, 81 *S. E. 2d* 175], the jury returned a verdict of guilty of murder in the first degree without recommendation and the defendant was sentenced to death. He appealed, urging that he was entitled to a new trial because of the trial judge's remarks during the *voir dire* examination. The trial judge had asked prospective jurors who had expressed opposition to capital punishment whether they "would not have put the defendants to death in the Greenlease kidnapping case that happened lately" and whether they would not have given death to the German officer who "lined up 50 American boys facing the wall and shot them in the back in cold blood." After the jurors were sworn, the trial judge told them that he had no idea that "anybody could possibly believe that the court was comparing the Greenlease case and the case of the murder of the American soldiers with this case," but that if anyone did get that impression he would excuse him since the defendant was "entitled to a jury with no prejudice." In reversing the conviction and setting aside the death sentence the North Carolina Supreme Court, in an opinion by Justice Ervin, pointed out that every person charged with crime "is entitled to a trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm" (*cf. State v. Rios,* 17 *N. J.* 572, 590 (1955)); that under the local statutes the trial judge could not express an opinion (*cf. State v. Riley,* 28 *N. J.* 188, 201 (1958)) as to the guilt or innocence of the defendant or as to the appropriate punishment to be meted out to him; and that although the trial judge had not intended to influence the jury but was endeavoring to test the strength of the scruples professed by the prospective jurors, his remarks improperly tended to indicate to the jurors that he believed that the defendant was guilty of murder in the first degree and ought to suffer death for his crime.

In the instant matter the trial court's remarks during the *voir dire* were undoubtedly intended to test the strength of the jurors' scruples against capital punishment and were not intended to influence them against the defendant. We believe, nevertheless, that their cumulative effect was to deprive the defendant of the fair trial to which he was justly entitled on the issue of life or death. When the trial court interrupted to stress that the jury's omission of a recommendation would not necessarily mean death to the defendant because "we have appeal courts and everything else, so a lot of things could happen," and to point out that only the other day a murder conviction was "reversed by the Supreme Court," it tended to dilute the jury's crucial sense of responsibility. Indeed, the trial court seemingly recognized this when later during the *voir dire* it said: "I do not want the jury to get the impression because I said that the death penalty imposed, but you do not know what might eventually happen, that they could just go in and just vote for it. Maybe it will not be carried out. I don't think that would be fair to the defendant." But the trial court did not either then or at any time thereafter instruct the jurors to disregard its earlier remarks and eliminate from their consideration the wholly irrelevant possibility that the defendant might, after conviction, obtain a reversal on appeal to the Supreme Court. And when the trial court asked the prospective jurors who had expressed their opposition to capital punishment, whether they would feel the same way if members of their families were the victims, it tended to inflame the minds of the jurors and to steel them against returning a recommendation of life imprisonment, as they were entirely free to do on consideration of all the evidence. We understand fully that the questions were asked because of the conscientious trial court's genuine concern about the number of prospective jurors who had expressed their opposition to capital punishment; but a jury was, in fact, being obtained fairly and without undue delay, and in view of the real issue in the

case justice demanded that nothing be permitted to occur during the trial which tended to deprive the defendant of the wholly impartial determination to which he was entitled on the issue of life or death. And, finally, when several of the prospective jurors expressed their opposition to capital punishment on religious grounds, the trial court should have withheld its extra-record assertion that the Catholic Church does not object to capital punishment, an assertion which may have tended to suggest to some of the jurors preferment of the death penalty over life imprisonment as the appropriate punishment for murder.

The State urges that the defendant was not prejudiced by the trial court's remarks during the *voir dire* and lays stress on the fact that he made no motion for mistrial and voiced no objection, except perhaps to the reference to the possibility of reversal on appeal. But where a life is at stake, this court does not hesitate in the interests of justice to invoke the plain error rule (*R. R.* 1:5–1) and to reverse where the trial errors were impregnated with the likelihood of having harmed the substantial rights of the defendant. See *State v. Wynn,* 21 *N. J.* 264, 271 (1956); *cf. Meszaros v. Gransamer,* 23 *N. J.* 179, 188 (1957). We are satisfied that the defendant's fair opportunity for a jury recommendation of life imprisonment was adversely affected by the remarks, and this becomes particularly evident when we consider the trial court's charge immediately preceding the submission of the case to the jury for its determination. The trial court properly instructed the jury that the statutory punishment for first degree murder is death unless the jury by its verdict and as a part thereof, upon and after consideration of all the evidence, recommends life imprisonment, in which event life imprisonment is the punishment imposed. But it then proceeded to state that the character of the sentence was not an issue for trial and that if the recommendation is omitted the penalty is death "determined not by the jury but by the statute," and that "it is not correct to say that the jury imposes the sentence of death,

where it does not choose to make the recommendation of life imprisonment, just as it would not be correct to say that a Court of Pardons or a Governor or any board acting in the place of the Court of Pardons imposes a death penalty, because it does not grant a pardon or commutation." This quoted language is not to be found anywhere in the governing statute (*N. J. S.* 2A:113–4) and was duly objected to by the defendant; it clearly tended to dilute the jury's sense of responsibility in passing on the issue of life or death in very much the same manner as did the trial court's earlier remarks about the possibility of reversal on appeal and as did the supplemental charge dealing with the defendant's opportunity for parole, which was held by this court to be erroneous and to warrant reversal in *State v. White, supra.*

It is true, as the State points out, that the quoted language may be found in earlier cases which did not, however, pass on the propriety of expressing it to the jury in the trial court's charge. Thus, in *State v. Molnar,* 133 *N. J. L.* 327 (*E. & A.* 1945), the court's holding was that the defendant was not entitled to a charge directing the jury's attention to a particular portion of the evidence relating to insanity. In the course of its opinion it discussed the history of *L.* 1919, *c.* 134, and then voiced the technical legal concept that where there is no recommendation of life imprisonment the penalty of death is determined by the law and not by the jury. But nowhere did the court suggest that the trial judge should so instruct the jury of laymen which has been entrusted by the Legislature with the crucial determination of life or death; and it seems clear to us that such instruction should be withheld as an improper diminution of the jury's sense of responsibility. In *State v. Bunk, supra,* and *State v. Cordasco,* 2 *N. J.* 189, 201 (1949), the concept voiced in *Molnar* was repeated but the charges which were there actually sustained on appeal had not in any manner conveyed the *Molnar* concept to the jury. Examination of the charges in the murder cases reported in our books since

the establishment of our new judicial system discloses that, except in isolated instances, the trial judges have soundly omitted in their entirety the unrealistically misleading and diluting statements which were made in the instant matter; and apparently in none of the prior charges was there general language to the effect that where the jury does not recommend life imprisonment it does not determine that the penalty shall be death any more than does a "Court of Pardons or a Governor" when "it does not grant a pardon or commutation."

In the light of all of the foregoing the conviction of the defendant Mount must be reversed and the matter remanded. But since the issue raised by the defendant as to the trial court's exclusion of the general background testimony offered on his behalf will undoubtedly be presented at the new trial we shall deal with it now. In excluding his background testimony and in charging that the crime itself and the circumstances under which it was committed form the criterion for the recommendation of life imprisonment or its refusal the trial court followed the sweep of the holding in *State v. Wise, supra.* There evidence relating to the defendant's background had actually been admitted as relevant to the issue of the defendant's confession, but the trial court had charged, at the State's request, that "evidence with reference to past life and antecedent background are out of place in a trial for crime and should not be considered by you in determining your verdict" and that "the crime itself and the circumstances under which it was committed form the criterion for a recommendation of life imprisonment or a refusal to recommend life imprisonment." This charge was sustained in an opinion which held that the phrase "all the evidence," in *N. J. S.* 2A:113-4, should be construed to mean all the evidence bearing on the defendant's guilt or innocence.

In the *Wise* case Justice Heher dissented and stressed the fact that the statute, in clear terms, says that all the evidence rather than all the evidence bearing on the defendant's

guilt or innocence shall be considered; he expressed the thought that the statute commits to the judgment and conscience of the jury the determination as to whether there shall be a recommendaion upon its view of "the evidence as a whole" and that the jury's proper inquiry is whether under all of the circumstances disclosed by the evidence it would serve the interests of justice as between society and the accused if capital punishment were not imposed; and he voiced the following comments to which, as intimated in *State v. White, supra,* 27 *N. J.,* at *page* 167, a majority of the members of this court now subscribe (19 *N. J.,* at *page* 108) :

"The statute in unmistakable terms empowers, indeed directs, the jury to consider 'all the evidence,' not a given part of the evidence, in the resolution of the crucial issue of death or life imprisonment as the penalty for murder in the first degree; and there is no standard laid down for the guidance or control of the jury in the exercise of the function. It is enjoined only to consider 'all the evidence' in the performance of the duty; and its action, after so doing, is not ruled by any criterion save its own collective discretion and judgment. This, by force of the broad terms of the statutory power.

'The authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court, or the jury, is of opinion that there are palliating or mitigating circumstances. But it extends to every case in which, upon a view of the whole evidence, the jury is of opinion that it would not be just or wise to impose capital punishment.' *Winston v. United States,* 172 *U. S.* 303, 309, 19 *S. Ct.* 212, 215, 43 *L. Ed.* 456 (1899)."

Justice Heher's dissent in *Wise* dealt with a case in which background evidence was actually admitted during the trial because of its relevancy to other issues and was then withdrawn by the trial court's charge from the jury's consideration of punishment to be imposed; it did not deal with a contention that background evidence should be admitted though it is offered solely because of its relevancy to the jury's determination of punishment. During the trial the defendant Mount's counsel sought to introduce testimony

from the defendant's parents and grandmother which he states was related primarily to "the defendant's early life," his "exposure to a broken home," and his "lack of schooling or religious training." He did not offer this evidence as foundation for Dr. Garber's later psychiatric testimony and does not complain, in any of his points on appeal, about the severe limitations which the trial court's rulings placed on that testimony. *Cf. State v. Lucas,* 29 *N. J.* 37 (1959). Nor did he offer the evidence as indicating insanity or mental deficiency. See *State v. Lucas, supra; State v. White, supra.* He offered the evidence because he believed "that the jury should have been permitted to evaluate the significance of the defendant's background in its deliberations respecting the degree of punishment." In support he cites the persuasive concurring opinion in *State v. White, supra,* 27 *N. J.,* at *page* 182 (which dealt, however, with evidence of insanity and mental deficiency) but acknowledges that the New Jersey decisions, dealing with evidence of general background, have opposed his stand. See *State v. Barth, supra,* 114 *N. J. L.,* at *page* 115; *State v. Favorito, supra,* 115 *N. J. L.,* at *page* 202; *cf. State v. James,* 96 *N. J. L.* 132 (*E. & A.* 1921). The problem is indeed a troublesome one and has been dealt with elsewhere in various fashions. See *Report, Royal Commission on Capital Punishment, pp.* 203–207 (1953).

In Pennsylvania, background evidence offered by the state as well as the defendant is freely admissible as relevant to the issue of punishment in first degree murder cases. This practice has the high virtue of furnishing to the jury, acting as the sentencing body when it has found guilt, adequate knowledge as to the nature of the man it is sentencing. See *Commonwealth v. Simmons,* 361 *Pa.* 391, 65 *A.* 2d 353 (*Sup. Ct.* 1949), *certiorari* denied, 338 *U. S.* 862, 70 *S. Ct.* 96, 94 *L. Ed.* 528 (1949); Francis, J., concurring in *State v. White, supra,* 27 *N. J.,* at *page* 183. But it also entails serious difficulties, for it may divert the trial to controverted background issues and may seriously

prejudice the defendant's opportunity for a fair trial on the primary issue as to his guilt of the crime charged. See *Commonwealth v. Simmons, supra; Knowlton, supra,* 101 *U. Pa. L. Rev.,* at *p.* 1112; *A. L. I., Model Penal Code,* § 201.6, at *p.* 74 *(Tent. Draft No. 9,* 1959). In California the issue of punishment may be determined by the jury in a separate proceeding following its finding of guilt; in that proceeding evidence may be presented "of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty." See *California Penal Code,* § 190.1; *cf. People v. Green,* 47 *Cal.* 2d 209, 302 *P.* 2d 307 *(Sup. Ct.* 1956). The *Royal Commission's Report on Capital Punishment, supra,* and the *Tentative Draft of the Model Penal Code, supra,* indicate general agreement that such practice of having a separate proceeding is best calculated to protect the interests of both the state and the defendant, but further legislation would seemingly be required to enable its adoption in New Jersey. However, there is nothing in the terms of our present legislation *(N. J. S.* 2A:113–4) which directs the exclusion of general background testimony and we believe that, pending further legislative enactment, the interests of justice will be best served if our trial judges exercise their judicial discretion so as to permit defendants in murder cases to introduce such background evidence within reasonable limitations. See *People v. Larrios,* 220 *Cal.* 236, 30 *P.* 2d 404, 405 *(Sup. Ct.* 1934):

"While the matter excluded by the court's ruling would have had no direct bearing on the homicide, nevertheless a person on trial for his life should, as against technical objections, be permitted to state, within reasonable limitations, something of his background. In some cases it may have a legitimate influence upon a jury in considering whether or not it should relieve the defendant of the extreme penalty of the law. In meting out the punishment for the commission of the crime of murder a jury, under the statute, is given a wide discretion."

*Cf. State v. Owen,* 73 *Idaho* 394, 253 *P. 2d* 203, 207, 224 (*Sup. Ct.* 1953); *State v. Henry,* 196 *La.* 217, 198 *So.* 910, 919 (*Sup. Ct.* 1940).

In actual practice, some evidence of the defendant's general background has invariably appeared during the trial, and there is little reason to doubt that the jury has properly considered it in the course of its deliberation on punishment. Thus the youth and immaturity of the defendant have been widely recognized as rational grounds for the recommendation of life imprisonment. See *People v. Ray,* 172 *Misc.* 1004, 16 *N. Y. S. 2d* 224, 227 (*Sup. Ct.* 1939), affirmed 259 *App. Div.* 1065, 22 *N. Y. S. 2d* 119 (*App. Div.* 1940), appeal dismissed, 282 *N. Y.* 680, 26 *N. E. 2d* 811 (*Ct. App.* 1940). His schooling, military service, employment, parentage and marital and family status, have been received in evidence, in whole or in part, and often without objection by the state. In the instant matter the particular questions which were asked by defense counsel and to which the State's objections were sustained, apparently were directed towards establishing that the defendant had come from a broken home and had at one time been placed in an orphanage. It seems to us that, if the punishment is at all to fit the offender as well as the crime (Francis, J., in *State v. White, supra,* 27 *N. J.,* at *page* 184), the defendant is justly entitled to have at least this evidence of general background before the jury. Viewed realistically and in the light of the trial court's undoubted power of keeping such background testimony within reasonable bounds, its introduction can hardly impair the orderliness or effectiveness of the proceedings or the true interests of the State in seeking a sound measure of justice as between society and the wrongdoer. Indeed, it may be doubted whether even those who still profess the most rigid adherence to the rule excluding background testimony would really pursue it to its logical end so as to exclude evidence that the defendant was of very young age—evidence which has invariably been admitted and deemed relevant on the issue of punishment.

Murder naturally arouses the impulses and challenges the judicial process for rational and dispassionate determination after fair and impartial trial. Some are convinced that where the murder is deliberate and premeditated, death is the only suitable penalty and that lesser punishment will not act as a sufficient deterrent or adequately protect society and voice its rightful condemnation. Others are abhorred by the State's taking of a life, are disturbed by the baneful effect of capital punishment on the administration of criminal justice, and believe that life imprisonment would be a sufficient deterrent and should replace the death penalty. With due regard for the opposing views, our Legislature has fixed the State's policy by providing, in effect, that the jury shall have absolute discretion to determine in the particular case before it and upon the basis of all the evidence before it whether justice will be better served by the imposition of life imprisonment rather than the penalty of death. If this legislative policy is to be given the sympathetic sweep to which it is entitled, our trial judges will carefully avoid action calculated to sway the jury in its choice of punishment and our appellate judges will carefully avoid rulings which have a comparable effect. For the reasons expressed earlier in this opinion the judgment of conviction is:

Reversed and the matter is remanded for a new trial.

BURLING, J. (concurring). The law of this State has been firmly settled that the only issue for trial in a prosecution for murder is the guilt or innocence of the accused; that only proof relevant to that issue is admissible. *State v. Wise,* 19 *N. J.* 59 (1955); *State v. Cordasco,* 2 *N. J.* 189 (1949); *State v. Molnar,* 133 *N. J. L.* 327 (*E. & A.* 1945); *State v. Favorito,* 115 *N. J. L.* 197 (*E. & A.* 1935); *State v. Barth,* 114 *N. J. L.* 112 (*E. & A.* 1935); *State v. James,* 96 *N. J. L.* 132 (*E. & A.* 1921); *State v. Maioni,* 78 *N. J. L.* 339 (*E. & A.* 1909).

Four years ago Mr. Justice Wachenfeld held in the *Wise* case:

"The highest tribunal of this State, despite an expressed minority view, has, from the time of the enactment of what is now *N. J. S.* 2A:113–4, consistently interpreted the phrase 'all the evidence' to mean only evidence bearing upon the defendant's guilt or innocence. This interpretation of the statute follows not only the obvious legislative intent to avoid speculation on the part of the jury and to narrow the issues for their deliberation, but accords with common sense in making basic justice more certain in its administration.

Were the rule otherwise, it is quite evident that first-degree murder trials might well become hopelessly mired in autobiographical sketches and psycho-sociological debates, submerging the true issue of guilt or innocence.

We doubt if the end result would be productive of justice, as the jury would be further burdened by emotional equations in their deliberations, created by testimony totally disassociated from the crime itself, relating to unfortunate incidents and others encountered by most mortals in the normal span of life." (19 *N. J.*, at *page* 106)

The majority indicate that the California system of a double hearing, one to determine guilt and a separate one to determine punishment, is "best calculated to protect the interests of both the State and the defendant," but that such a course is a legislative one. I am in agreement that the California procedure is preferable to that currently employed in New Jersey. But, in the absence of the legislation required to adopt that procedure, I would not depart from the course charted by the previously cited cases in this jurisdiction. So long as guilt and punishment are determined in the same proceeding, the evils which attend the presentation of proofs of the general background of the defendant far outweigh its advantages in the administration of the criminal law, which must ever strike a balance between fairness to the accused and the protection of society.

In Mr. Justice Francis' concurring opinion in *State v. White,* 27 *N. J.* 158, 182 (1958), relied upon by the majority here, it was said:

"A capital case is the only one in which, after a finding of guilt, the jurors sentence the defendant. They are told that if they return a verdict of murder in the first degree, the death penalty is manda-

tory, but that if they recommend imprisonment for life 'no greater punishment shall be imposed.' *N. J. S.* 2A:113–4. In dealing with every other type of criminal offense, a judge fixes the punishment (except in a few instances where the Legislature has established a mandatory minimum penalty). However, in no instance can a judge, no matter how long his experience in administering the criminal law or how vast his knowledge of human nature, sentence a defendant without first obtaining a pre-sentence report from the probation department of the county involved. *R. R.* 3:7–10(b). Such reports are prepared by men trained in the field of criminal responsibility. They range over the entire life of the offender—his religious training, education, environment, family life, work habits, medical history, if any, and the like—in an endeavor to bring to the mind of the court all of the elements pertinent to the degree of punishment and potentiality for rehabilitation. And if either the probation department or the judge feels that a psychiatric examination is desirable or may be helpful, it is ordered." (*27 N. J.*, at *page* 183)

Pre-sentence reports do indeed range over the entire life of the offender—and so must the course of the proofs in a homicide prosecution if evidence of the "general background" of the defendant is admissible solely because of its relevancy to punishment. The inevitable result of such a course is the projection of myriad factual disputes which are not only collateral and irrelevant to the issue of guilt, but which tend to confuse and confound the jury in its determination of guilt. See *Hayden, "Criminal Law and Procedure,"* 13 *Rutgers L. Rev.* 105, 125, 126 (1958).

Here the defendant sought to introduce general background evidence which, as stated by counsel in his brief, related to "the defendant's early life, exposure to a broken home, lack of schooling or religious training and such other matters pertinent to his antecedence." Defendant further requested and was denied a charge reading in part: "I do charge you that you may consider the defendant's age, mental capacity, *human passions or weaknesses,* in determining whether you shall recommend life imprisonment, if you find the defendant guilty of murder in the first degree." (Emphasis supplied)

It is apparent that defendant was attempting to open the door with respect to proofs relating to his past life,

including, but not limited to, the fact that he came from a broken home and was at one time placed in an orphanage.

It is the duty of this court to lay down general principles of law, universal in their application, and sufficiently certain in scope so as to provide a guide for conduct.

It is said that evidence relevant to punishment should be kept within "reasonable bounds." This standard has sufficient vagueness to insure that we will be plagued with the problem for some time to come.

When the issue is life or death, the scope of relevant proof is assuredly broad. Does the standard of reasonable bounds import the notion that some evidence, although relevant and not unduly cumulative, can nevertheless be excluded in the discretion of the trial court? If not, then the reasonable bounds referred to are as broad as the issue to which the proofs are addressed.

Presumably the evidence offered must conform to the rules of law regarding the admissibility of evidence, although this is not so in a pre-sentence investigation report where patent hearsay is frequently incorporated.

One of the problems which must be considered in the determination of whether the defendant can introduce proofs in mitigation of punishment is: can the State introduce countervailing proofs in aggravation of the punishment? Surely it cannot be suggested that the truth in relation to the question of punishment travels on a one-way street. For instance, the California statute cited by the majority, *Deering's Penal Code of California,* § 190.1 (1957 *Pocket Supplement*), allows the State to introduce facts in aggravation of the penalty, as well as the defendant to mitigate punishment.

In *Commonwealth v. Simmons,* 361 *Pa.* 391, 65 *A.* 2d 353 (*Sup. Ct.* 1949), *certiorari* denied, 338 *U. S.* 862, 70 *S. Ct.* 96, 94 *L. Ed.* 528 (1949), cited by the majority, it is said:

"The court, over objection, admitted in evidence the official records of defendant's previous criminal offenses,—the conspiracy to rob in Lancaster County and the participation in a robbery in Dauphin

County. These records were admissible in order to aid the jury in its function of fixing the penalty if they found the crime to be one of murder in the first degree; evidence of former convictions has been accepted for that purpose ever since the passage of the Act of May 14, 1925, *P. L.* 759; *Commonwealth v. Parker,* 294 *Pa.* 144, 143 *A.* 904; *Commonwealth v. Williams,* 307 *Pa.* 134, 160 *A.* 602; *Commonwealth v. Harris,* 314 *Pa.* 81, 171 *A.* 279; *Commonwealth v. Holley,* 358 *Pa.* 296, 56 *A.* 2d 546." (65 *A.* 2d, at *page* 358.)

See also *Commonwealth v. Parker,* 294 *Pa.* 144, 143 *A.* 904 (*Sup. Ct.* 1928). If evidence of previous conviction of crime, although relevant to punishment, be excluded because it is too prejudicial to the issue of guilt where the defendant does not take the stand, see *e. g., Knowlton, "Problems of Jury Discretion in Capital Cases,"* 101 *U. of Pa. L. Rev.* 1009, 1111–1116 *et seq.* (1953), the State is put at the decided disadvantage of having the defendant select witnesses who would paint a glowing picture of his virtues, while the State could not show that the defendant had been previously convicted of crime—no matter how heinous the offense.

Under the standard employed by the majority the resolution of these questions must await future determination in capital cases. In this area of the law, above all, the law ought not to be in an unsettled state.

For all of the foregoing reasons I would adhere to the previously settled view that evidence relevant solely to the question of punishment is inadmissible in a prosecution for homicide. The orderly and practical administration of criminal justice requires that the problems herein be settled by comprehensive legislative and not piecemeal judicial action.

I concur in the result reached by the majority on the other points specifically raised by the appellant on this appeal, and accordingly vote to reverse the judgment from which the appeal is taken and to remand the cause for a new trial in accordance with the views expressed in this opinion.

PROCTOR, J. (concurring). I vote to reverse and in doing so I concur in the opinion of the majority with the exception of that part which deals with the admission or exclusion

of testimony relating to defendant's background, and in that respect I agree with the views expressed by Mr. Justice BURLING in his concurring opinion.

BURLING, PROCTOR and HALL, JJ., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For affirmance*—None.